## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Pegasus Rural Broadband, LLC, *et al.*,[1] | Case No. 11-11772 (PJW) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF HOWARD VERLIN IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY ORDERS AND RELATED RELIEF

I, Howard Verlin, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am Executive Vice President of Xanadoo Spectrum, LLC, a Delaware limited liability company ("Spectrum") and Xanadoo Holdings, Inc., a Delaware corporation ("XHI"). Spectrum, XHI and its Delaware limited liability subsidiaries, Xanadoo, LLC ("XLC"), Pegasus Guard Band, LLC ("PGB"), and Pegasus Rural Broadband, LLC ("PRB"), are the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"). I have been an officer of Xanadoo Company ("Parent") and its predecessors and their respective subsidiaries since 1987, and am an officer of all of the Debtors since their existence. I am familiar with the Debtors' day-to-day operations, financial condition, books and records, and business affairs.

2.      All facts set forth in this declaration are based upon my personal knowledge, information supplied to me by individuals at the Debtors who work with me or under my

---

[1] The Debtors are Xanadoo Spectrum, LLC, a Delaware limited liability company; Xanadoo Holdings, Inc., a Delaware corporation; Xanadoo, LLC, a Delaware limited liability company; Pegasus Guard Band, LLC, a Delaware limited liability company; and Pegasus Rural Broadband, LLC, a Delaware limited liability company. Xanadoo Holdings, Inc. is the sole member of Xanadoo, LLC, Pegasus Guard Band, LLC, and Pegasus Rural Broadband, LLC. Xanadoo Holdings, Inc. is a wholly owned subsidiary of Xanadoo Spectrum, LLC.

supervision, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations and financial affairs. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

3.    I submit this declaration on behalf of the Debtors, in support of their:   (a) voluntary petitions (collectively, the "<u>Petitions</u>") for relief under Chapter 11 of Title 11, United States Code, as amended (the "<u>Bankruptcy Code</u>"); and (b) "first day" motions and applications, which are being filed in connection herewith (the "<u>First Day Motions</u>").   The purpose of this declaration is to provide the Bankruptcy Court and other interested parties with information that will assist them in understanding the facts and circumstances that compelled the filing of these Chapter 11 cases.

4.    The first part of this declaration provides an overview of the Debtors' corporate structure, business and indebtedness, and summarizes the events that led to these Chapter 11 filings. The second part of my declaration outlines the relief the Debtors are requesting in their First Day Motions. Capitalized terms that are used by not defined in this declaration have the meanings ascribed to such terms in the First Day Motions.

<strong><u>BACKGROUND</u></strong>

**(A)    The Debtors' Corporate Structure and Operations[2]**

5.    Spectrum is a wholly-owned subsidiary of the Parent. XHI is a direct, wholly-owned subsidiary of Spectrum, a Delaware corporation, and was incorporated in Delaware in 2002. XHI, through its Xanadoo, LLC subsidiary XLC, offers wireless high-speed broadband service, including digital phone services, under the Xanadoo brand utilizing licensed frequencies in the 2.5 GHz

---

[2] A true and correct chart setting forth the Debtors' corporate structure is attached hereto as **<u>Exhibit A</u>**.

frequency band. As of May 31, 2011, XLC served approximately 12,000 subscribers in multiple cities in Texas, Oklahoma and Illinois. Subscribers to the Xanadoo branded service use a desktop or laptop modem to access the Internet over a wireless network at speeds from 128 kilobits per second to 3.0 megabits per second, depending upon the service plan selected. The modems are "plug-and-play", meaning that they do not require a professional installation or external antenna, and enable mobile/portable Internet access throughout the Xanadoo network coverage areas. XLC holds exclusive rights to use 2.5 GHz spectrum covering approximately 8.5 million people in 11 states. XLC holds these rights through a combination of licenses that it owns outright and approximately 79 licenses that it leases pursuant to long term leases with nonprofit educational institutions. Because the 2.5 GHz spectrum that XLC holds rights to is a limited resource, these rights have significant value.

6.      XHI also provides service over unlicensed frequencies in the 900 MHz, 2.4 GHz and 5 GHz frequency bands through its Pegasus Rural Broadband, LLC ("PRB") subsidiary. PRB provides high-speed wireless internet access to approximately 750 subscribers in rural areas of central Texas.

(i)      **The 700 MHz Licenses**[3]

7.      PGB holds 23 licenses for the 700 MHz A Block (the "A Block") issued by the Federal Communications Commission ("FCC"). These licenses (the "PGB A Block Licenses"), which were acquired by PGB in two FCC administered auctions in 2000 and 2001 for a cost of approximately $96 million in cash, provide PGB the exclusive right to utilize 2 MHz in the 700 MHz

---

[3] Marshall W. Pagon, CEO of Xanadoo Company, also has knowledge of the 700 MHz licenses, their operation, and their fair market value. Mr. Pagon will be available to testify at the "first day" hearings as to those subjects.

frequency band[4] within geographic areas that include approximately 170 million people. The geographic areas within the licensed areas include substantially all of the East Coast and Midwest, most of the West Coast, as well as Hawaii, Alaska, Puerto Rico and the American Possessions.[5] Based upon recent transactions involving other FCC licenses in the 700 MHz frequency band, I believe that the PGB A Block Licenses have a value of between $200 million and $400 million.

8.      There is no carrying cost to the Debtors, in terms of FCC license fees, to hold the 700 MHz A Block licenses.  Accordingly, these licenses are a significant asset of the Debtors, with little associated liabilities.

9.      The 700 MHz frequency band is considered by most wireless and telecommunications experts to be perhaps the single most valuable frequency band licensed by the FCC for commercial use. It comprises 108 MHz of spectrum between 698 MHz and 806 MHz – 84 MHz licensed for private, commercial use and 24 MHz reserved for use by local, state and Federal public safety users (police, fire and emergency medical).  Historically, this spectrum was licensed for use by UHF TV stations on channels 59 to 68.  However, the 1996 Telecommunications Act mandated that the FCC re-purpose this spectrum for use in advanced, two way wireless communications. In the last fifteen years, legacy TV stations have been cleared from the frequency band and 74 MHz of the 84 MHz allocated for commercial use have been auctioned, raising over $21 billion for the U.S. Treasury.

10.     The remaining 10 MHz, the so-called "D Block", has not yet been auctioned, because the Obama Administration is supporting pending legislation that would re-allocate the D Block for

---

[4] A true and correct representation of the 700 MHz frequency band is attached hereto as **Exhibit B**.

[5] A true and correct representation of the geographic areas covered by the 700 MHz licenses is attached hereto as **Exhibit C**.

use by Public Safety and fund more than $10 billion to build a nationwide public safety broadband network. It is the Administration's stated objective that this legislation, which would implement one of the principal recommendations of the 9/11 Commission, be passed into law this year, the tenth anniversary of 9/11. Verizon, AT&T and other wireless carriers who have purchased commercial licenses in the 700 MHz frequency band are using this spectrum for the launch of their so-called "fourth generation" (4G) networks this year. The PGB A Block Licenses are located between the Verizon 700 MHz spectrum (purchased at a cost of approximately $5 billion) and the D Block (valued by the Congressional Budget Office ("CBO") at between $3 billion and $3.5 billion).

    **(ii)**    **Valuation**

11.    Licenses issued by the FCC for use in commercial, wireless communications are typically valued "per MHz per POP" (or "MHz POP"), which is a metric calculating the product of the amount of licensed spectrum (in MHz or megahertz) multiplied by the total population (POPs) within the licensed area. As an example, in 2008 the FCC auctioned 58 MHz of 700 MHz licenses covering the entire US, approximately 16.5 billion MHz POPs, for total auction proceeds of $21 billion – approximately $1.27 per MHz POP. The CBO estimate of value for the D Block cited above is based upon a per MHz POP valuation determined in part on the results of the 2008 700 MHz auction.

12.    Using 2010 Census data, the PGB A Block Licenses comprise approximately 340 million MHz POPs (2 MHz of licensed spectrum multiplied by 170 million POPs within the licensed area). While there have been no transactions involving the sale of A Block licenses since the 2000 and 2001 auctions (substantially all of the A Block licenses are held by two companies, PGB and Access Spectrum), there have been numerous transactions involving other 700 MHz licenses. These transactions include FCC auctions held in 2000, 2001 and 2008, as well as private transactions in

5

which AT&T purchased approximately 5 billion MHz POP from Qualcomm and a variety of private license holders in 2007, 2010 and 2011. These transactions (and the per MHz POP valuations implicit in them) form the basis for the CBO's annual estimate of the value of the D Block, as well as the valuation range for the PGB A Block Licenses cited above.

### (iii)     Other Material Considerations

13.     The PGB A Block Licenses are located between the Verizon 700 MHz licenses and the D Block.  As noted above, the 1996 Telecommunications Act requires that the D Block be auctioned for commercial use.  Despite this legislative mandate, the FCC has not yet proceeded to auction the D Block, because there is pending Federal legislation supported by the Obama Administration that would rescind that mandate and instead require the FCC to re-allocate the D Block for use in a nationwide Public Safety broadband network.

14.     It is believed by many wireless experts that the highest valued use of the A Block would be in combination with the D Block. As a result, a coalition that includes substantially all of the U.S.' commercial wireless carriers (including Sprint, T-Mobile, Access Spectrum and PGB) other than AT&T and Verizon have supported proposals that the A Block (including the PGB A Block Licenses) be combined with the D Block and that the A Block licensees (including PGB's) be compensated out of a resulting auction of the combined A and D Block licenses.  Separately, a similar proposal for combining the A and D Blocks has been made in the context of pending legislation to re-allocate the D Block to Public Safety. Incorporation of these proposals in Federal legislation, or their adoption by the FCC, represent one of the means by which the Debtors' Estate could realize fair value for the PGB A Block Licenses.

### (iv) The 2.5 GHz Licenses

15.     The Debtors use FCC-regulated 2.5 GHz radio licenses over which they transmit their wireless high speed internet services in the operation of their licensed broadband business. These 2.5 GHz radio licenses are a limited resource and issued on an exclusive basis in discreet geographic areas such that the holder of the license has the exclusive right, in the area of issuance, to transmit on the frequencies covered by the license.

16.     The bulk of the 2.5 GHz radio licenses that Debtors use are leased from third parties who own the actual license.    The leases are also regulated by the FCC in regard to whether certain parties can hold the leases and the terms that may be agreed to between the parties.

17.     In addition to those 2.5 GHz licenses that the Debtors lease in order to provide their high speed internet services, the Debtors lease a significant number of strategic 2.5 GHz licenses that Debtors do not presently use in their broadband business, but which Debtors believe have value in terms of either (i) their desirability for potential use in networks that Debtors may construct and develop in the future or (ii) as an asset that has value to others who may desire to use them in this or other capacities ("Future Use Licenses").

18.     Presently, the 2.5 GHz licenses carry with them an FCC mandated "substantial use" obligation, requiring that the licenses be put to a substantial use prior to a date certain (which is now November 1, 2011).    If the "substantial use" obligation is not met the licenses will be subject to cancellation by the FCC and will no longer be available to Debtors in any capacity.    The parties that Debtors lease these licenses from are generally not-for-profit educational institutions who are not in a position, or unwilling, to invest their independent funds in making the required "substantial use" of the licenses.

19.     The 2.5 GHz licenses that Debtors presently use in the provision of their high speed internet services on their constructed networks will have all been deemed to have met the "substantial use" obligation by virtue of Debtors use of the frequencies in their high speed wireless networks.    The Future Use Licenses that Debtors lease will not be deemed to have met the "substantial use" obligation unless Debtors take action to assist the licensees of those licenses in meeting the FCC's "substantial use" obligation.

20.     In an effort to aid the licensees of the Future Use Licenses and maintain the availability of the Future Use Licenses to the Debtors, Parent (through a non-Debtor subsidiary, Xanadoo Round II, LLC) has contracted for and funded the purchase and costs to deploy equipment on a select group of these Future Use Licenses.    Debtors have selected the Future Use Licenses for this treatment based on the Debtors evaluation of their strategic value in terms of the geographic areas and numbers of persons that they provide coverage of as well as other strategic considerations. Efforts to meet the Substantial Use obligation on these Future Use Licenses are ongoing and in some cases have been completed.    Parent has already paid $224,850.00 of the total contract costs of $299,400.00 to meet the "substantial use" obligation on a select group of the Future Use Licenses on behalf of the Debtors.    The remaining payments, in the amount of $74,550.00, will have to be made in the future upon achievement of certain milestones related to completion of the project.

**(B)     Pre-Petition Capital Structure and Financing**

21.     XHI entered into a Securities Purchase Agreement (the "SPA") with Post Advisory Group, LLC (now Beach Point Capital Management LP as successor to Post Advisory Group, LLC) (collectively, "Beach Point") as Collateral Agent for a principal amount of $30,000,000 in exchange for the issuance of 12.5% Senior Secured Promissory Notes with a maturity date of May 17, 2011 (the "Notes") to various funds for which Beach Point acted as managing member, general partner, or

authorized agent. Interest on the Notes is payable semi-annually and, at the option of XHI, may be paid in certain circumstances through the issuance of additional Notes. On May 17, 2007, as part of the financing, warrants to purchase common stock of XHI were issued to the purchasers of the Notes.

22.     The warrants entitle the holders to acquire 17% of the stock of XHI at an aggregate exercise price of approximately $19.7 million and are puttable by the holders, in certain circumstances, for a payment of $7 million. Certain funds or accounts managed or advised by the collateral agent are the largest holder of shares of perpetual preferred stock of Xanadoo Company. Shares held by these funds and accounts were purchased in the open market.

23.     Debtors' obligations under the SPA are secured by liens on substantially all of the Debtor's assets and the equity interests in XHI and its subsidiaries, except for FCC licenses, which cannot be directly pledged.

24.     As noted above, the Notes bear interest at 12.5% per annum, payable semi-annually in arrears, or 14.5% if the Notes are in default. XHI is subject to certain financial and operational covenants measured on a quarterly and annual basis. Beginning March 31, 2008, XHI failed to comply with certain of these financial and financial statement related covenants. On November 25, 2008, an amendment to the SPA was entered into that provided for an additional $1.1 million in Notes to be issued in return for the receipt of additional cash.

25.     During the three year period in which the Notes were in default, XHI and its subsidiaries implemented many measures to preserve cash and reduce its expenditures including multiple layoffs, the shutting down of retail stores, and the renegotiation of certain payment obligations while engaged in discussions with the collateral agent to resolve the defaults and restructure the Notes.

26.     Soon after the May 17, 2011 Notes maturity date, XHI received a Notice of Maturity.

27.     June 9, 2011, XHI received a letter captioned "Exercise of Remedies under Parent Pledge Agreement".

28.     The Debtors filed for bankruptcy on June 10, 2011 when it felt sufficiently threatened by actions to be taken by Beach Point and realized that consensual restructuring discussions had become fruitless.

29.     As of the Petition Date, holders of the Notes were entitled to receive a payment of approximately $52 million representing repayment of notes and accrued interest and if the put right is deemed exercisable, an additional $7 million payment with respect to the XHI warrants.

**(C)     The Management Services Contract**

30.     In connection with the issuance of the Notes, those Debtors who are parties to the SPA and the Parent entered into the management fee and cost allocation agreement dated May 17, 2007 (the "Management Services Contract") with the full knowledge and approval of Beach Point. The Management Services Contract allows the Parent and its subsidiaries to fully maximize economies of scales and efficiencies in such areas as insurance, healthcare, and real property leases.

**(D)     Consolidation of Debtors' Operations**

31.     In 2010, due to our inability to reach agreement with Beach Point for additional extension of credit and amended loan terms, the borrower instituted a series of cost cutting initiatives in order to become financially self-sufficient.  In the summer of 2010, we closed all the retail stores and kiosks in our six operating markets and severed our fulltime sales personnel.

32.     Since that time, we have relied on one key retailer in each market to serve as a local point of presence to facilitate in market customer transactions (swaps, returns, etc), a series of small independent retailers and regional chains as resale outlets, a fulltime sales manager, and six part time agents who support the resellers.  These steps generated approximately $180,000 in annual savings in

real estate expense and approximately $360,000 in annual savings in personnel costs.

33.    In the fourth quarter of 2010 we ceased all advertising and severed our three-person marketing team. This action saved approximately $145,000 in annual advertising costs and approximately $315,000 in annual personnel costs. During the same period we downsized our field operations staff and outsourced our network monitoring function. This change to our technical team generated $140,000 in annual savings (net of the outsourcing expense).

34.    The Debtors' largest expense after personnel cost are tower expenses. In the fall of 2010 we successfully renegotiated our contract with our largest tower landlord and several of our smaller tower landlords. The negotiations generated $385,000 in annual savings.

35.    In the first quarter of 2010, we are able to make the investments necessary (approximately $75,000) to upgrades our core network to full Wimax capabilities. Subsequently, we have introduced full Wimax service to two of our markets (Decatur and Lawton) and plan to upgrade two more markets (Lubbock and Springfield) this summer. This step allows us to offer new generations of modems with higher speeds and mobility. We plan to begin offering these new services this summer.

36.    As a consequence of all these cost saving measures and productivity enhancements, the Debtors have dramatically decreased their cash consumption. For instance, in the 3 month period between February and April 2009 the cash and cash equivalent line on the balance sheet shows a decrease of $468,000. In the same period of 2011, the decrease was $65,000 and pro forma for one-time investments (in the core network, substantial service, and severance totaling approximately $80,000) would have increased by approximately $15,000.

**(E)    The Proposed Reorganization**

37.    Due to the emergency nature of the filing, precipitated by Beach Point's threatened

exercise of remedies under the SPA, the Debtors have not yet formulated a complete restructuring plan. Nevertheless, the Debtors believe that the substantial value of the 700 MHz licenses, together with its other assets and operations, provide the Debtors with at least two potentially viable paths for reorganization.

38.     The Debtors may be able to find new funding sources to replace Beach Point and allow the Debtors to exit these bankruptcy cases in control of all or substantially all of its assets. As the value of the Debtors licenses, particularly the 700 MHz licenses, are well in excess of the Debtors' liabilities, the Debtors believe that they would be well-positioned to exit these cases with a financing package that would enable the Debtors' to continue their operations outside of bankruptcy for the foreseeable future.

39.     Alternatively, the Debtors may be able to sell the 700 MHz licenses for an amount substantially in excess of all amounts owed to Beach Point. The Debtors believe that the current fair market value for these licenses is in excess of $200 million. The value may be greatly increased depending on changes to the evolving regulatory environment with respect to spectrum. The Debtors believe that holding the 700 MHz licenses while the regulatory environment clarifies with respect to these licenses will significantly benefit the Debtors' estates and its creditors. Additionally, the Debtors believe that, as it comes into focus, the regulatory environment will favor the Debtors.

## THE BANKRUPTCY FILINGS AND "FIRST DAY" MOTIONS

40.     On June 10, 2011, (the "Petition Date"), each of the Debtors filed a Petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their property as debtors in possession.

41.     In connection with the Chapter 11 filings and the Debtors' stated objectives, a number of First Day Motions and proposed orders have been filed with this Court. I have reviewed

each of the First Day Motions, including the exhibits to the same, and the facts set forth in those documents are true and accurate, to the best of my knowledge, information and belief. On behalf of the Debtors, I respectfully request that the Court consider entering the proposed orders and granting the relief requested in those First Day Motions, as the relief requested is vital to the Debtors' ability to make an orderly transition into Chapter 11 without significant disruption to the Debtors' business or loss of value.

**(A)      Motion for Order Authorizing Joint Administration of These Cases**

42.     The Debtors seek an order authorizing joint administration, for procedural purposes only, under the case number assigned to PRB. Joint administration of these related bankruptcy cases will assist in the efficient and economical administration of these cases, by permitting the Clerk of the Court to maintain a single general docket, and allowing the Clerk, the Debtors and other parties in interest to combine notices to creditors. Many, if not all, of the motions, hearings and orders that will arise in the cases will affect all of the Debtors, and joint administration of these cases will avoid the expense, inefficiency and confusion that would necessarily result from the filing and service of pleadings in duplicate.

43.     The rights of creditors will not be adversely affected by the joint administration of these cases, as this First Day Motion seeks only administrative, not substantive, consolidation of the estates. All creditors will benefit from the cost savings, and the granting of this motion will insure that all creditors are aware of the various matters filed in these related cases.

**(B)      Cash Management Motion**

**(i)       The Cash Management System**

44.     In the ordinary course of business, the Debtors utilize an integrated cash management system to collect and disburse funds (collectively, the "Cash Management System").

45.     As described more fully below, the continuation of the Cash Management system will not prejudice the rights of any party in interest, but rather will benefit all creditors by minimizing the disruption to the Debtors' businesses and by preserving the administrative savings with the Cash Management System currently provides.  The Cash Management system provides a cost-effective and efficient means of managing the Debtors' finances.  Maintenance of the Cash Management System will benefit all creditors by reducing daily operating expenses of the Debtors' estates. Failure to continue the Cash Management System would disrupt the Debtors' operations and impose financial and administrative burdens on the estates.[6]

46.     The Cash Management System network is comprised of various accounts at approximately three (3) banks.  The Debtors also maintain a system designed to accurately record such collections, transfers and disbursements as they are made.  All of the accounts that are part of the Debtors' current, active Cash Management System are in the names of Xanadoo, LLC, Pegasus Rural Broadband, LLC, or Xanadoo Holdings, Inc.  As of the Petition Date, the principal flow of funds through the Cash Management System, which the Debtors seek to maintain, is as follows:

47.     Deposit Accounts.  The Debtors' have three (3) ZBA deposit accounts for the Debtors' credit card receipts and lockbox deposits (the "Credit Card & Lockbox Deposit Accounts"), which represent the majority of the Debtors' incoming funds.  All of these deposit account balances are transferred daily into the Master Account (defined below) at PNC Bank through multiple ZBA transactions.

---

[6] Indeed, on the Petition Date, subsequent to the filing of the Debtors' bankruptcy petitions, the Debtors received word from PNC Bank, where the Debtors maintain various bank accounts, that it intended to freeze the Debtors' accounts at PNC Bank.

48.     Master Account and other Operating Accounts.  The Debtors maintain a master account with PNC, into which all of the deposit accounts flow, and out of which all cash expenditures are made, whether directly or indirectly (the "Master Account").  The Debtors' also maintain an Investment Account with LPL Financial and TD Bank which are used to invest excess cash in treasury and other low risk bonds.  The Debtors also have a payroll account that is funded from the Master Account and from which the Debtors ACH specified amounts to ADP, the Debtors' payroll service company.  In addition, the Debtors fund a Flexible Spending Account and a Health Savings Account out of the payroll account, which holds funds certain of the Debtors' employees have earned and earmarked for withholding in accordance with that benefit program.  With respect to the Flexible Spending Account, CBIZ issues payment to the Debtors' employees on account of the payroll due in accordance with the Debtors' practices. Though, as described above, all active bank accounts are in the names of Xanadoo, LLC, Pegasus Rural Broadband, LLC, or Xanadoo Holdings, Inc.

49.     The Debtors' Cash Management System is similar to those commonly employed by corporate entities of similar size and complexity.  The continued use of the Debtors' Cash Management System allows for, among other things, the efficient tracking and control of funds, while at the same time, reducing administrative costs.  Moreover, PNC, the Debtors' principal operating bank, is intimately familiar with the Debtors' systems, which will facilitate the transition into Chapter 11, and is an approved bank in accordance with § 345 of the Bankruptcy Code.

**(ii)     The Debtors' Existing Business Forms**

50.     In the ordinary course of business, the Debtors use a variety of business forms. The continued use of existing correspondence and other business form, in particular those

relating to the bank accounts, will avoid adverse effects to the Debtors' operations, which would be anticipated were the Debtors' required to suspend business functions pending transition to new forms. To minimize disruption and expense to the estates, the Debtors request authority to continue to use existing stock of forms including, but not limited to, checks, letter head, purchase orders and invoices, as such forms were in existence immediately prior to the Petition Date. Upon depletion of Debtors' forms stock, the Debtors will obtain new business forms stock reflecting their status as debtors-in-possession.

**(C)    Motion for Entry of Order for Authorization to Pay Prepetition Taxes**

51.    In the ordinary course of the Debtors' business, they pay to the Taxing Authorities either previously collected or estimated Taxes. Sales Taxes accrue as the Debtors sell internet services, and are calculated based upon statutorily mandated percentages or amounts. The Debtors typically pay use Taxes as they accrue in the ordinary course of business.

52.    Use Taxes accrue as the Debtors purchase fixed assets, supplies, and/or signage without paying sales taxes, among other things. The process by which the Debtors remit the Taxes varies according to the nature of the Taxes and the Taxing Authorities to be paid. The Debtors estimate that Taxes collected but not yet paid to the Taxing Authorities aggregate approximately $10,000 covering May through the Petition Date. The Debtors seek authority to pay all pre-petition Taxes owed to the Taxing Authorities.

53.    Also, the Debtors pay personal and real property taxes to certain of the Taxing Authorities (the "Property Taxes"), thus authorizing the Debtors to operate their businesses in the applicable taxing jurisdiction. The Debtors estimate that they owe approximately $15,000-$20,000 in such Property Taxes to certain of the Taxing Authorities for the period prior to and including the Petition Date. There is also an additional $28,000 of all prepetition property taxes

that is currently on a payment plan. Accordingly, the Debtors seek authority to pay up to $40,000 on account of the prepetition Business and License Fees, Annual Report Taxes and Property Taxes.

**(D)    Debtors' Utilities Motion**

54.    In the ordinary course of their business, the Debtors incur utility expenses for electricity, telephone service, internet service, and other services. Approximately thirty utility providers (as such term is used in section 366 of the Bankruptcy Code, collectively, the "Utility Providers") provide these services to the Debtors. On average, the Debtors spend approximately $6,000 each month on utility costs.

55.    Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' Chapter 11 cases. Without these utility services, the Debtors would be unable to operate and would be forced to shut down.

56.    In the event the Court approves the Debtors' proposed debtor in possession financing facility, the Debtors expect to have adequate funds to timely pay all postpetition obligations owed to their Utility Providers and intend to do so. Indeed, the Debtors' proposed budget explicitly sets forth the Debtors' anticipated postpetition expenditures to the Utility Providers. The Debtors submit that the inclusion of the Utility Providers' anticipated charges provides grant sufficient adequate assurance to the Utility Providers.

**(E)    Customer Programs**

57.    4.    A portion of the Debtors' revenue is derived from the sale of prepaid cards "Prepaid Cards"). Prepaid Cards are sold by resellers directly to the Debtors' customers. These cards allow customers to buy wireless service in blocks of days instead of a traditional monthly service arrangement. Prepaid Cards can be bought in blocks of 14 to 120 days.

58.     The Debtors bill these resellers when the customers activate their Prepaid Cards on the Debtors' network. On average, there is about $45,000-$50,000 dollars of service (revenue) owed to customers relating to activated Prepaid Cards.

59.     The company earns approximately $35,000 of revenue a month from Prepaid Cards.

60.     The Debtors also offer a 14-day money back guarantee to all new subscribers from the purchase date of their equipment. As the majority of the Debtors' customers buy their equipment through resellers, there is minimal liability for the company.

61.     The Debtors also allow existing subscribers to swap any defective equipment for new equipment providing that the customer's account is in good standing.

**(F)     Critical Vendors' Motion**

      **(i)     Critical Vendors**

62.     In the ordinary course of business, the Debtors rely on certain third parties to supply goods and services, without which the Debtors either could not operate or would operate at significantly reduced efficiency. The Debtors have established relationships with a number of vendors and believe that these relationships ensure continued access to quality goods and services that provide substantial savings and benefits to the Debtors' businesses. These vendors and services include, among other things, towers, bandwidth, resellers, and technical consultants.

63.     The vendors give the Debtors a level of certainty that quality and reliable services will be rendered in accordance with the specific needs of the Debtors' businesses. Accordingly, any disruption in the services of such vendors would have a detrimental impact upon the quality of service provided by the Debtors to their customers. Given the highly competitive market for internet services in which the Debtors operate, such a disadvantage would lead to an immediate

erosion in customer confidence and have an adverse effect on the Debtors' reputation, which could be impossible to restore.

64.     The Debtors owe certain of these aforementioned vendors (each, a "<u>Critical Vendor</u>" and, collectively, the "<u>Critical Vendors</u>") amounts for pre-petition goods and services. Without the continued support of, and goods and services provided by, the Critical Vendors, the Debtors may not be able to continue operating and providing internet service without great added cost and likely delay.

65.     Despite the need for the receipt of essential goods and services, the Debtors historically have sought to bargain with their vendors to achieve the lowest price, when taken together with the best possible service and quality, and the most favorable payment terms possible for each necessary product or service. The Debtors have adopted valued relationships with many suppliers that have met the Debtors' standards for price, service, quality, and payment terms, and hope to maintain and improve upon those vendor relationships on a post-petition basis and continue to negotiate and unsure such standards going forward.

66.     The Debtors believe that certain of the Critical Vendors, despite the protections of administrative priority status, may refuse to provide goods or services postpetition to the Debtors if they do not pay all or part of the Critical Vendor Claims.

67.     The Categories of Critical Vendors for whom payment of prepetition claims is sought are as follows:

    a.     *Towers*:  The Debtors rent towers that provide them with a geographical footprint for their operations. The Debtors lease their towers. Most of the towers the Debtors lease are the only available towers in the particular market. Some of these leases have only a few months remaining or are with small family-owned businesses. Renewals of such leases (including negotiations) could be negatively impacted by the failure to satisfy pre-petition obligations.

b.      *Bandwidth*:     The bandwidth purchased by the Debtors connects its subscribers to the internet.  Bandwidth is not covered by any long-term contracts and is primarily purchased on a month-to-month basis.  Debtors' bandwidth providers are typically the only source of bandwidth in their markets. Failure to satisfy pre-petition balances could result in higher rates going forward and the potential for these providers to drop the Debtors as customers.

c.      *Resellers*:     In an effort to save costs, the Debtors closed their retail store presence in 2010.  Currently, the Debtors use a network of resellers (the "Resellers") to acquire almost all of our subscribers.  The Resellers receive commissions from the Debtors for customers that remain subscribers for designated periods of time.  These Resellers also act as a retail presence for the Debtors' customers in its markets where customers can purchase new equipment, make exchanges, or trade-in old equipment.  Failure to satisfy pre-petition balances would negatively impact the Resellers desire to sell the Debtors' products to new customers and help the Debtors service the existing customer base.

d.      *Credit Cards*:  The Debtors supply and are responsible for payment of company credit cards (the "Company Cards") which are used by sales and support staff to purchase fuel when they travel to the Debtors' customers and vendors.  Failure to satisfy pre-petition balances owed on the Company Cards may result in the credit car company canceling the Debtors' cards or imposing terms or restrictions on the Debtors' use of those cards which could negatively impact the Debtors' cash-flow.

e.      *Technical Consultants / Specialized Service Providers*: Due to the nature of the specialized nature of the Debtors' businesses, the Debtors' utilize certain vendors that have unique experience with the Debtors' industry and its organization.  Services provided by these vendors include, but are not limited to: database administration and reporting, network infrastructure management and maintenance, radio frequency engineering, storage of internet activity as required by law, and voice over internet protocol services.  There are no long term contracts in place with these vendors.  Failure to pay these vendors' claims could result in these vendors refusing to do business with the Debtors.  It may take considerable time for the Debtors to find new technical consultants or specialized service providers. Additional time will be needed to bring new vendors up to speed with the Debtors' operations.  This delay could impact the quality of the services the Debtors' provide to their customers.  Moreover, it is uncertain whether the quality and cost of the services provided by new vendors would be as good or better than the quality and service currently provided by these vendors.

f.      *Kathleen Wallman and Paul Kolodzy*: Ms. Wallman, who is a former Chief of the FCC's Common Carrier Bureau and member of the Clinton White House, is a well known expert in wireless regulation. Dr. Kolodzy, who is a

former Senior Consultant to the Chairman of the FCC on advanced wireless technology and Program Manager within the Defense Advanced Research Projects Agency (DARPA) of the Department of Defense for advanced wireless communications, is one of the foremost experts on the use of the 700 MHz for advanced wireless communications."

68.    The Debtors propose to make full or partial payment to a Critical Vendor pursuant to this Motion only the extent they deem necessary, in the exercise of their business judgment, to ensure that the applicable Critical Vendor would provide essential goods and services to the Debtors on a postpetition basis.  To further assure that the Debtors' business operations would be minimally impacted during these Chapter 11 cases, the Debtors seek to condition such payments upon an express agreement by the Critical Vendors to provide reasonable and customary price, service, quality and payment terms ("Customary Trade Terms") or upon other favorable terms to the Debtors on a postpetition basis.[7]

**(ii)    Proposed Critical Vendor Procedures**

69.    In light of the severe consequences the Debtors may suffer if the Critical Vendors refuse to provide post-petition goods and/or services, the Debtors propose that the Court approve and adopt the following procedures (the "Critical Vendor Procedures"):

> a.    The payment of the Critical Vendor Claims would be conditioned upon the express agreement of each of the Critical Vendors to continue supplying goods and services to the Debtors on Customary Trade Terms.  A letter substantially in the form attached to the motion as **Exhibit B** (or as may be modified pursuant to the Final Critical Vendor Order), along with a copy of the Interim Order and/or the Final Order, as applicable, granting the relief requested in this Motion would sent to

---

[7] Nothing in the critical vendor motion shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors or any party-in-interest's right to dispute any such claim, or (c) an approval or assumption of any agreement, contract, program, policy or lease under section 365 of the Bankruptcy Code or otherwise. Furthermore, any payment made pursuant to the authority requested herein is not intended and should not be construed as an admission of the validity of any claim or waiver of the Debtors' right to dispute such claim subsequently, and the Debtors reserve all related rights.

the Critical Vendors. The letter would include, without limitation the following information and terms:

        i.     The amount of a Critical Vendor's estimated prepetition claim, accounting for any setoffs, other credits and/or discounts thereto, which would be mutually determined in good faith by a Critical Vendor and the Debtors (but such amount would be used only for the purposes of determining the Critical Vendor Claim under the Interim Order and/or Final Order, as applicable and would not be deemed a final claim allowed by the Court for any other purposes in these cases, and all rights of all interested persons to object to such claims would be fully preserved until further order of the Court);

        ii.    A Critical Vendor's agreement to provide goods and services to the Debtors based upon Customary Trade Terms or upon such other favorable terms as the Debtors and Critical Vendor may agree;

        iii.   A Critical Vendor's agreement to provide the Release or upon such other favorable terms as the Debtors and the Critical Vendor may agree;

        iv.   A Critical Vendor's acknowledgement that it has reviewed the terms and provisions of the Interim Order and/or Final Order, as applicable, and consents to be bound thereby;

        v.    A Critical Vendor's agreement that it will not separately seek payment for any reclamation claims or claims under section 503(b)(9) of the Bankruptcy Code outside the terms of the Critical Vendor's participation in the program to pay Critical Vendor Claims pursuant to the Critical Vendor Orders is terminated; provided, however, that such claims would, if thereafter raised by a Critical Vendor as permitted by the Critical Vendor Orders, be treated as though raised on the date of the Final Critical Vendor Order; and

        vi.   A Critical Vendor's agreement that any payments received by such Critical Vendor under the Critical Vendor Orders would be applied first to claims for the value of goods received by the Debtors within 21 days of the Petition Date that were sold to the Debtors in the ordinary course of business, and then to any other claims.

        b.    Such a letter, once agreed and accepted by a Critical Vendor, would be the agreement (the "Vendor Agreement") between the parties that governs their relationship during these cases. To the extent that the Debtors and a Critical Vendor have not, despite diligent efforts, agreed upon and entered into a Vendor Agreement, the Debtors would nonetheless have the right to pay such Critical Vendor if they determine that failure to pay the Critical Vendor Claim would be likely to result in irreparable harm to the Debtors' business operations. The Debtors further would

retain the right, on a case-by-case basis, to obtain other written acknowledgement from the Critical Vendors of the terms to which the parties have agreed.

        c.     If a Critical Vendor refuses to supply goods and/or services on Customary Trade Terms or fails to comply with other terms to which the parties have agreed, following its receipt of payment on the Critical Vendor Claim, or fails to comply with the applicable Vendor Agreement in any way, the Debtors may, in their discretion and without further order of this Court, declare that a Critical Vendor is in breach of its Vendor Agreement with the Debtors. To the extent a Critical Vendor fails to cure such a default or reach an alternative agreement with the Debtors, the Debtors may seek appropriate relief from this Court, including, without limitation, injunctive relief to compel performance pursuant to the Vendor Agreement. In addition, if a Critical Vendor refuses to comply with the Customary Trade Terms or fails to comply with any other terms to which the parties have agreed, any payment made to a Critical Vendor on account of a Critical Vendor's pre-petition claim would be deemed to have been in payment of any then outstanding post-petition obligations owed to a Critical Vendor, and a Critical Vendor would be required to immediately repay to the Debtors any payment previously made to it on account of its pre-petition claim pursuant to this Motion, to the extent the aggregate amount of such payments exceeds the postpetition obligations then outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

        d.     The Debtors would maintain a summary list of all payments made to the Critical Vendors, and would provide updated copies of such lists to the United States Trustee, the postpetition lender, and any official committee(s) appointed in these cases on a monthly basis.

**(G)    Proposed retention of Elliott Greenleaf as Bankruptcy Counsel**

70.    The Debtors seek to retain Elliott Greenleaf ("EG") as their general bankruptcy counsel with regard to the filing and prosecution of these bankruptcy cases. EG has extensive experience in the field of debtors' and creditors' rights, business reorganizations and 363 sales under Title 11 of the Bankruptcy Code, and has the ability to effectively represent the Debtors in these matters.

71.    In addition, in preparation for the fillings, EG has become familiar with the Debtors' business, its financing arrangements and many of the specific issues that are likely to arise in these cases. Accordingly, I believe that EG is both well-qualified and uniquely suited to represent the

Debtors.

**(H)  Ordinary Course Professionals**

72.    The Debtors customarily retain the services of various attorneys, accountants, consultants and other professionals and experts to assist them in matters arising in the ordinary course of their business unrelated to these Chapter 11 cases (each, an "Ordinary Course Professional" and collectively, the "Ordinary Course Professionals").

73.    In contrast, the Debtors have filed (or will file) individual retention applications for any professionals the Debtors seek to employ in connection with the administration of these chapter 11 cases (the "Chapter 11 Professionals"). The Chapter 11 Professionals will be permitted to be compensated an reimbursed only in accordance with related procedures to be approved by this Court, including interim and final fee applications.

74.    The Ordinary Course Professionals will not be involved in the administration of these chapter 11 cases, but rather will provide services in connection with the Debtors ongoing business operations or services. As a result, the Debtors believe that the Ordinary Course Professionals are "professionals" as that term is used in section 327 or 328 of the Bankruptcy code, whose retention must be approved by this Court, subject to the limitations contained below. Nevertheless, out of an abundance of caution, the Debtors hereby seek an order authorizing the retention and payment of all Ordinary Course Professionals during the pendency of these chapter 11 case pursuant to the procedures described herein.

**(I)  Wages Motion**

75.    The Debtors have approximately 25 employees to whom they owe certain pre-petition wages, salaries, reimbursable business expenses, medical expenses, administrative plan payments and other pre-petition employee-related obligations (collectively, the "Pre-Petition

Employee Obligations") that the Debtors believe are necessary to honor in order to maximize the value of the estates. The Debtors also request entry of an Order directing financial institutions to honor all checks and electronic payment requests relating to the foregoing Wages, Salary and Related Compensation

76.     Approximately half of the Debtors' employees are employed at the Debtors' corporate headquarters, with the remainder of the employees working in the markets in which the Debtors' provide wireless Internet Services. The Debtors' full-time salaried employees are generally paid for services provided and are paid on a current biweekly basis. Full and part time hourly employees are generally paid for services provided and are paid with one week in arrears on a biweekly basis. The Debtors last satisfied their payroll obligations on June 9, 2011 for the period ending June 11, 2011 for full time salaried employees and for the period ending June 4, 2011 for full and part time hourly employees. Therefore, as a result of the timing of the Chapter 11 cases, most of the Debtors' employees will be owed wages, salary and other payments (the "Pre-Petition Payroll Obligations") on account of pre-petition services. The Debtors' aggregate monthly payroll totals approximately $150,000 ($35,000 for hourly employees). The Debtors estimate that the amount owed to their employees on account of pre-petition services to be approximately $9,000. Accordingly, the Debtors seek authority to pay Pre-Petition Payroll Obligations in an amount not to exceed $10,000, to prevent any unnecessary disruption to the workforce and to the Debtors' operations. The Debtors' estates will not be prejudiced by this relief because the aggregate payment to or on behalf of any one person shall not exceed the § 507(a)(4) priority limit of $11,725.

(a)     **Reimbursable Business Expenses**

77.     The Debtors believe it is important to continue payment reimbursable business expenses to their employees on a regular basis. This includes both amounts reimbursable in cash

or check upon presentation of appropriate documentation of business expenses, as well as payment under the Debtors' employee credit card program, pursuant to which employees have business credit cards under which they are personally liable. Due to the timing of the submission and processing of reimbursement requests, the Debtors are unable to accurately estimate the total amount of such expenses that are outstanding as of the Petition Date. In 2010, those expenses averaged approximately $5,000 per month and included, among other things, business-related travel expenses, business meals, car rentals and other miscellaneous business expenses (collectively, the "Business Expense Obligations"). All Business Expense Obligations were incurred by employees on the Debtors' behalf, in connection with their employment by the Debtors, and in reliance upon the Debtors' reimbursement policy. Accordingly, the Debtors request that they be authorized to pay all reimbursable Business Expense Obligations, regardless of amounts exceeding the $11,725 priority, so long as such amounts were incurred in the ordinary course of business.

### (b)     Health Insurance and other Insurance Plans

78.     The Debtors provide their full-time Employees -- at a substantially reduced cost -- with certain medical, prescription drug, and dental insurance programs through various providers (collectively, the "Medical Benefit Obligations"). Specifically, full-time Employees, who have served two full calendar months, are offered (i) medical insurance and prescription drug coverage benefits through Aetna (ii) dental insurance benefits through Delta Dental. The Aetna health insurance plan is a High Deductible Plan through which participating employees establish Health Savings Accounts. The Debtors' fund each participating employee's Health Savings Account on a quarterly basis such that the total amount funded annually is equal to fifty percent of the deductible established within the Aetna High Deductible Plan. The Debtors pay

approximately seventy-five percent of the cost of the medical plans for their employees and the employees pay their portion through pre-tax payroll contributions. The Debtors estimate that the aggregate monthly cost to the Debtors to fund the Medical Benefits Obligations is approximately $18,000. The Debtors request authorization to maintain their health-related employee benefit plans and to pay pre-petition amounts due or accrued in connection with these plans.

**(c)     Life and Disability Insurance Programs**

79.     The Debtors provide their active full-time Employees with certain life and disability insurance programs. Particularly, Employees, who been employed for two full calendar months and who work a minimum of 35 hours per week, are offered (i) life and (ii) short term disability insurance, both of which are underwritten by The Lincoln National Life Insurance Company ("Lincoln"). Those insurance policies are 100% employer paid and begin on the first of the month after two full calendar months of employment for eligible employees. As of the Petition Date, the Debtors have amounts owing to Lincoln of $600.

**(d)     Vacation and Sick Time**

80.     The Employees are covered by the Debtors' vacation policy (the "Vacation Policy"). Under the Vacation Policy, full-time Employees are be eligible for up to four weeks of paid vacation annually depending upon the number of hours worked, position, and number of years of credited service. Part-time Employees accrue vacation time on a pro-rated basis in accordance with the number of hours worked during a pay period (excluding overtime hours), not to exceed ten (10) days per calendar year. The Employees, subject to approval, may carry over up to five (5) accrued and unused vacation days to the next calendar year. Upon termination of their employment, the Employees are entitled to a cash payout for any accrued

and unused vacation time. The total annual cost to the Debtors for the Employees' vacation time under the Vacation Policy is approximately $90,000.

81.     The Debtors also provide full-time and part-time Employees with sick pay benefits in the event that an Employee becomes ill and is unable to work. Regular, full-time Employees accrue sick time each pay period in accordance with the number of hours they are scheduled to work per week, up to a maximum of five (5) days per calendar year. Part-time Employees accrue sick time on a pro-rated basis in accordance with the number of hours they work during the pay period (excluding overtime hours), not to exceed five (5) days per calendar year. In addition to sick leave, full and part-time Employees receive up to four (4) personal days per calendar year. The total annual cost to the Debtors for the Employees' sick and personal leave is approximately $30,000 and $23,000, respectively for an aggregate of $53,000, and is included in gross payroll. Accrued and unused sick and personal days do not carry over to the following calendar year, and Employees are not entitled to a cash payout for such accrued and unused time upon termination of their employment or otherwise.

82.     The following paid holidays each year for employees are: New Year's Day, Martin Luther King Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Friday after Thanksgiving Day and Christmas Day. By this Motion, the Debtors seek authority to honor all liabilities to their Employees that arose under their vacation, sick, personal leave policies and holiday pay prior to the Petition Date. The Debtors anticipate that their Employees will utilize any accrued vacation, sick or personal leave in the ordinary course of business, without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.

**(e)      Savings and Retirement Plans**

83.     The Debtors have a defined savings plan for their employees, which is qualified under section 401(k) of the Internal Revenue Code (the "<u>Savings Plan</u>").  The Saving Plan is administered by The Newport Group.  All active employees who have completed at least one full calendar month of service following their date of hire are eligible to participate in the Savings Plan.  Pursuant to the Savings Plan, the Debtors make deductions from each participating Employee's payroll check and transfer the withheld funds to the plan trustee.  Additionally, under the Savings Plan, the Debtors provide matching contributions, in cash, equal to 100% of each participating employee's pre-tax contribution up to 3% of the employee's annual base salary and 50% of each participating employee's pre-tax contribution from 3% to 5% of the employee's annual base salary.  The Debtors have not yet funded the matching contributions related to 2010 or 2011 employee contributions.  The Debtors have until the end of the year following the year of contribution by which to fund the employer portion of the match.  The approximate amount of accrued matching funds is $70,000.  The Debtors request authorization to continue making deductions, as directed by their participating employees and to turn over such amounts to the third-party administrator along with employer matching contributions in the ordinary course of business.

**(f)      Severance Benefits**

84.     The Debtors provide certain severance benefits (the "<u>Severance Plan</u>") to their Employees who have been involuntarily terminated for reasons other than unsatisfactory performance.  The applicable amount of severance benefit under the Severance Plan is as follows:  (i) non-management employees is two weeks of base pay for each year of service with a minimum of four weeks; (ii) management employees is four weeks of base pay for each year of

service with a minimum of twelve weeks, however, employees with the title of Vice President and above have a minimum severance benefit of 26 weeks. The Debtors currently have $40,000 of severance obligations owing to former employees.

85. By this Motion, the Debtors seek authority to (i) continue the Severance Plan, and (ii) honor any obligations arising under the Severance Plan owed to the Employees after the Petition Date. The Debtors believe that continuing their Severance Program is vital to the retention of employees and any interruption in this program would severely harm the Debtors' estates.

**(g)    Social Security, Income and Other Withholding**

86. The Debtors routinely deduct from employee paychecks amounts that the Debtors are required or directed to transmit to third parties, including Social Security, FICA, federal and state income taxes, flexible spending account contributions, health savings account contributions, garnishments, health care payments and 401(k) plan withholdings. The Debtors believe that such withheld funds, to the extent they remain in the Debtors' possession, constitute funds held in trust and, therefore, are not property of the Debtors' estates. Thus, whether such funds are for pre-petition amounts or not, the Debtors believe that directing such funds to the relevant parties is appropriate in the ordinary course of business and does not specifically require Court approval. Moreover, the failure to make these payments will result in hardship to the Debtors and their employees as the Debtors would be inundated with inquiries from the designated recipients were the Debtors to fail to submit the withholdings. Further, if the Debtors were unable to remit certain of these amounts, the employees could face legal action, or even imprisonment. Accordingly, the Debtors request that the Court confirm that they may direct disbursement of the withholdings to the proper parties in the ordinary course of business.

**(h)    Honoring Related Checks and Electronic Transfers**

87.    In furtherance of the relief requested, the Debtors respectfully request that the Court authorize and direct the Debtors' financial institutions to receive, process, honor and pay all checks and electronic payment requests relating to the Pre-Petition Employee Obligations described herein.  Absent such relief, the Debtors' banks may not be certain of their rights or obligations, causing both confusion and delay in the provision of such payments.

**(J)    Claims Agent Motion**

88.    The Debtors have over 200 creditors. The sheer size and magnitude of the Debtors' creditor body would most likely make it impracticable for the Office of the Clerk of Court to undertake the tasks of noticing creditors and administering claims.

89.    I believe that the most effective and efficient manner of noticing creditors and parties in interest in these Chapter 11 cases, and administering the claims process, is for the Debtors to engage an independent third party to act as the Debtors' notice, claims, and balloting agent.  The Debtors may also require the services of an agent to administer votes pursuant to any plan of reorganization or liquidation.  Accordingly, the Debtors propose to employ Epiq Sytems, Inc. ("Epiq") as the notice, claims, and balloting agent, inter alia, to assist the Debtors in distributing notices, as necessary, and to process other administrative information pertaining to these Chapter 11 cases.

90.    Epiq specializes in noticing, claims processing, balloting, and other administrative tasks in chapter 11 cases. Therefore, the Debtors wish to engage Epiq to send out certain designated notices and to collect and monitor claims and perform certain ballot-related functions with respect to these Chapter 11 Cases. The Debtors chose Epiq based on both its experience and

the competitiveness of its fees. I believe that Epiq is well-qualified to serve in this capacity and that Epiq's retention is in the best interests of the Debtors' estates and their creditors.

**(K)    Interim Compensation**

91.    The Debtors seeks entry of an order for authority to establish procedures for the compensation and reimbursement of court-approved professionals on a monthly basis, and on terms comparable to similar procedures which have been routinely followed in this district. This process will provide the appropriate balance between efficient administration of fee applications for the estate's professionals while still providing the Court and parties-in-interest with sufficient opportunity to review, and where appropriate, object to, payments to professionals

**(L)    DIP Motion**

92.    Due to the emergency nature of these bankruptcy cases the Debtors were left with no alternative but to seek postpetition financing from the Parent.  Debtors and Parent intend the DIP Facility Agreement to act as bridge financing while the Debtors explore the market for alternative sources of postpetition financing on similar terms.  If Debtors are unable to find acceptable postpetition financing, the Parent has committed to providing postpetition financing for the pendency of these chapter 11 cases, pursuant to the terms of the DIP Facility Agreement. To that end, the DIP Note does not mature until a full year-and-a-half after the loan closing date. Under these circumstances, Debtors submit that the DIP Facility Agreement is fair and reasonable, and should be approved.

**(i)    Need for Post-Petition Financing**

93.    As demonstrated by the Debtors' budget, attached as Exhibit A to the DIP Facility, the Debtors do not have sufficient available sources of working capital, including Cash Collateral, to operate in the ordinary course of business without the financing requested in the

DIP Motion. The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of their estates for the benefit of all creditors of the Debtors. Moreover, the ability of the Debtors to obtain sufficient working capital and liquidity through the proposed DIP Facility is vital to the preservation and maintenance of the going concern value of the Debtors. Accordingly, the Debtors have an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates.

94.    In connection with the DIP Facility, the Debtors and the Lender have agreed upon a 3-month budget.  Based upon (i) certain assumptions regarding the effect that the filing of the Chapter 11 cases will have on the business, made with the assistance of various professionals retained to advise the Debtors in connection with their bankruptcy filing, and (ii) the projections provided by such professionals regarding the professional fees to be incurred in connection with the Chapter 11 cases, I believe that the budget is achievable and will allow the Debtors to operate and pay their post-petition obligations as they mature.

95.    The terms and conditions of the DIP Facility Agreement are fair and reasonable. Approval of the DIP Facility will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including post-petition wages and salaries and utility and vendor costs. Unless these expenses are paid, the Debtors will be forced to cease operations, which would likely (i) result in irreparable harm to their business, (ii) deplete going concern value, and (iii) jeopardize the Debtors' ability to

maximize value. The credit provided under the DIP Facility Agreement and the use of Cash Collateral will enable the Debtors to continue to satisfy their vendors, service their customers, pay their employees, and operate their business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all stakeholders.

90. The availability of credit under the DIP Facility Agreement will provide confide6ce to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors. Finally, the implementation of the DIP Facility Agreement will be viewed favorably by the Debtors' vendors, employees, and customers, thereby promoting a successful resolution of these Chapter 11 cases. Accordingly, the timely approval of the relief requested in the Financing Motion is imperative.

## CONCLUSION

97. To preserve the value of their business to the fullest extent possible, the Debtors' immediate objective is to maintain "business as usual" following the commencement of these Chapter 11 cases by minimizing any adverse impact of the chapter 11 filings on the Debtors' operations. For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in each of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and information.

Dated: June 12, 2011

Howard Verlin
Executive Vice President of the Debtors