# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Pegasus Rural Broadband, LLC, *et al.*,[1] | |
| Debtors. | Case No. 11-11772 (PJW) |
| | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 361, 362, 363, 364 AND 507 OF THE BANKRUPTCY CODE AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES AND (V) SCHEDULING A FINAL HEARING PURSUANT TO FED. R. BANK. P. 4001(b) AND (c) LOCAL RULE 4001-2(c)**

Xanadoo Spectrum, LLC and its subsidiaries, each a debtor and debtor-in-possession herein (together, the "Debtors"), by their undersigned proposed attorneys, hereby move (the "Motion") this Court for entry of the proposed interim and final orders (respectively the "Interim Order" and "Final Order" and, collectively "DIP Order") authorizing the Debtors to, *inter alia*, (i) obtain post-petition financing pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure in an amount not to exceed $1,600,000.00 (the "DIP Facility"), by entering into the revolving credit agreement (the "DIP Facility Agreement"), by and among Debtors (each, individually a "Borrower" and, collectively, "Borrowers") and

---

[1] The Debtors are Xanadoo Spectrum, LLC, a Delaware limited liability company; Xanadoo Holdings, Inc., a Delaware corporation; Xanadoo, LLC, a Delaware limited liability company; Pegasus Guard Band, LLC, a Delaware limited liability company; and Pegasus Rural Broadband, LLC, a Delaware limited liability company. Xanadoo Holdings, Inc. is the sole member of Xanadoo, LLC, Pegasus Guard Band, LLC, and Pegasus Rural Broadband, LLC. Xanadoo Holdings, Inc. is a wholly owned subsidiary of Xanadoo Spectrum, LLC.

Corporation, a Delaware corporation ("Lender"), (ii) use cash collateral pursuant to Section 363 of the Bankruptcy Code, (iii) grant DIP Facility Liens and a DIP Facility Superior Claim to the Lender as security for the repayment of the DIP Obligations, and (iv) scheduling a final hearing in sixty days. In support of this Motion, the Debtors rely on the *Declaration of Howard Verlin in Support of Chapter 11 Petitions and First Day Orders and Related Relief* (the "Verlin Declaration") filed contemporaneously herewith, and further respectfully state as follows:

## BANKRUPTCY RULE 4001 CONCISE STATEMENT

1. Material provisions of the DIP Facility Agreement, attached hereto as Exhibit A,[2] are set forth in the following sections of the DIP Facility Agreement and/or the Interim Order:[3]

    (a) **Borrowers:** Borrowers are Pegasus Rural Broadband, LLC; Pegasus Guard Band, LLC; Xanadoo Spectrum, LLC; Xanadoo Holdings, Inc.; Xanadoo, LLC. DIP Note at Section 19 and Recitals.

    (b) **Lender:** Lender is Xanadoo Company. DIP Note at Section 19 and Recitals.

    (c) **Fees:** Revolving Loan Agreement with commitment and maximum amount of $1,600,000.00, available by advances on demand. Borrowers may borrow, repay and reborrow for the purposes of paying professional fees and Bankruptcy Court costs set forth in the Approved Budget, for all items other than professional fees and Bankruptcy Court costs, and for all items other than professional fees and Bankruptcy Court costs, to borrow once every week; provided, further, that the Lender may in its sole discretion lend more often than once every week. DIP Note at Section 1. DIP Agreement at Section 1. Borrowers shall pay to the Lender a nonrefundable financing fee (the "Facility Fee") equal to 4% of the Maximum Amount payable on the Maturity Date. DIP Note at Section 8.

---

[2] Capitalized terms used but not defined in this Motion shall have the meaning set forth in the DIP Order or, if not defined therein, the DIP Facility Agreement.

[3] The summaries and descriptions of the terms and conditions of the DIP Facility Agreement and the Interim Order as set forth in this Motion are intended for informational purposes only to provide the Court and parties in interest with an overview of the significant terms and conditions contained therein and should only be relied upon for such purposes. The summaries and descriptions contained herein are qualified in there entirety by the DIP Facility Agreement and the Interim Order. To the extent that a conflict exists between this Motion and the DIP Facility Agreement or Interim Order, the DIP Facility Agreement or Interim Order shall control in all respects.

(d): **Interest Rate**: The Interest Rate is Twelve and a half percent (12.5%). DIP Note at Section 19. Upon the occurrence and continuance of an event of default, the Interest Rate will increase by two percent (2%) per annum. Id. at Section 4.

(e) **Maturity Date**: The Maturity Date is December 11, 2012 or upon termination by default if no third-party final DIP financing is procured. DIP Note at Section 19.

(f) **Lien on Avoidance Action:** The Interim and Final Orders would grant Lender Postpetition Liens in the DIP Collateral and a DIP Superpriority Claim by authorizing the Borrowers to use cash collateral and grant adequate protection to the Prepetition Senior Secured Lenders and (b) incur post-petition secured indebtedness, (ii) granting security interest and super-priority claims pursuant to 11 U.S.C. Sections 364(c) and (d), and (iii) granting adequate protection pursuant to U.S.C. 361 and 363. Interim Order at Section 8(a)

(g) **Carve-Out:** Professional fees would require a carve-out in the amount of $886,250 to satisfy the Approved Budget, comprised of the following: $415,000 for Bankruptcy counsel; $81,250 for DIP counsel; $260,000 for financial advisors and investment bankers; and $130,000 for Committee professionals. DIP Note at Section 1 and Approved Budget.

## JURISDICTION

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to § 28 U.S.C. 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3. On June 10, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code. The Debtors have continued in the management of their businesses and property as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

4. No committee or trustee has been appointed in these cases.

**The Debtors' Prepetition Lender**

5. XHI entered into a Securities Purchase Agreement (the "SPA") with Post Advisory Group, LLC (now Beach Point Capital Management LP as successor to Post Advisory Group, LLC) (collectively, "Beach Point") as Collateral Agent for a principal amount of

3

$30,000,000 in exchange for the issuance of 12.5% Senior Secured Promissory Notes with a maturity date of May 17, 2011 (the "Notes") to various funds for which Beach Point acted as managing member, general partner, or authorized agent. Interest on the Notes is payable semi-annually and, at the option of XHI, may be paid in certain circumstances through the issuance of additional Notes. On May 17, 2007, as part of the financing, warrants to purchase common stock of XHI were issued to the purchasers of the Notes.

6. The warrants entitle the holders to acquire 17% of the stock of XHI at an aggregate exercise price of approximately $19.7 million and are puttable by the holders, in certain circumstances, for a payment of $7 million. Certain funds or accounts managed or advised by the collateral agent are the largest holder of shares of perpetual preferred stock of Xanadoo Company. Shares held by these funds and accounts were purchased in the open market.

7. Debtors' obligations under the SPA are secured by liens on substantially all of the Debtor's assets and the equity interests in XHI and its subsidiaries, except for FCC licenses, which cannot be directly pledged.

8. The Notes bear interest at 12.5% per annum, payable semi-annually in arrears, or 14.5% if the Notes are in default. XHI is subject to certain financial and operational covenants measured on a quarterly and annual basis. Beginning March 31, 2008, XHI failed to comply with certain of these financial and financial statement related covenants. On November 25, 2008, an amendment to the SPA was entered into that provided for an additional $1.1 million in Notes to be issued in return for the receipt of additional cash.

9. During the three year period in which the Notes were in default, XHI and its subsidiaries implemented many measures to preserve cash and reduce its expenditures

including multiple layoffs, the shutting down of retail stores, and the renegotiation of certain payment obligations while engaged in discussions with the collateral agent to resolve the defaults and restructure the Notes.

10. Soon after the May 17, 2011 Notes maturity date, XHI received a Notice of Maturity.

11. On June 9, 2011, XHI received a letter captioned "Exercise of Remedies under Parent Pledge Agreement".

12. The Debtors filed for bankruptcy on June 10, 2011 when it felt sufficiently threatened by actions to be taken by Beach Point and realized that consensual restructuring discussions had become fruitless.

13. As of the Petition Date, holders of the Notes were entitled to receive a payment of approximately $52 million representing repayment of notes and accrued interest and if the put right is deemed exercisable, an additional $7 million payment with respect to the XHI warrants.

**The Proposed Reorganization**

14. The Debtors do not have sufficient cash flow to fund their businesses as going concerns on a stand alone basis and, therefore require postpetition financing.

15. Due to the emergency nature of the filing, precipitated by Beach Point's threatened exercise of remedies under the SPA, the Debtors have not yet formulated a complete restructuring plan. Nevertheless, the Debtors believe that the substantial value of the 700 MHz licenses, together with its other assets and operations, provide the Debtors with at least two potentially viable paths for reorganization.

5

16. The Debtors may be able to find new funding sources to replace Beach Point and allow the Debtors to exit these bankruptcy cases in control of all or substantially all of its assets. As the value of the Debtors licenses, particularly the 700 MHz licenses, are well in excess of the Debtors' liabilities, the Debtors believe that they would be well-positioned to exit these cases with a financing package that would enable the Debtors' to continue their operations outside of bankruptcy for the foreseeable future.

17. Alternatively, the Debtors may be able to sell the 700 MHz licenses for an amount substantially in excess of all amounts owed to Beach Point. The Debtors believe that the current fair market value for these licenses is in excess of $200 million. The value may be greatly increased depending on changes to the evolving regulatory environment with respect to spectrum. The Debtors believe that holding the 700 MHz licenses while the regulatory environment clarifies with respect to these licenses will significantly benefit the Debtors' estates and its creditors. Additionally, the Debtors believe that, as it comes into focus, the regulatory environment will favor the Debtors.

**RELIEF REQUESTED**

18. The Debtors make this Motion for orders[4] on an interim and final basis seeking:

    a. authorization for the Debtors to obtain secured postpetition financing (the "<u>DIP Financing</u>") of up to $1,600,000 pursuant to the terms and conditions set forth in the Interim Order and the DIP Note;

---

[4] To the extent any terms of this Motion and any subsequent order on this Motion conflict, the terms of the order shall govern.

b. authorization for the Debtors to execute the DIP Note and to perform such other acts as may be necessary or desirable in connection with the DIP Financing;

c. authorization for the Debtors to grant to the DIP Lender first priority liens upon and security interests in substantially all of the Debtors' assets and secure all obligations owing under the DIP Note;

d. authorization to grant allowed superpriority administrative expense claims to the DIP Lenders;

e. authorization for the Debtors to use Cash Collateral;

f. acknowledgment that the Prepetition Lender is adequately protected;

g. to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing on the Motion to be held before this Court to consider entry of the Interim Order authorizing the Debtors to borrow up to the maximum amount of the DIP Note pursuant to the terms of the Interim Order and the DIP Note until entry of the final order;

h. to schedule, pursuant to Bankruptcy Rule 4001(c)(2), a hearing to consider entry of a final order authorizing, on a final basis, the DIP Financing and all relief requested in the Motion; and

i. Granting the Debtors such other and further relief as the Court may deem just and proper.

19. Due to the emergency nature of these bankruptcy filings, Debtors and Lender intend the DIP Facility Agreement to act as bridge financing while the Debtors explore the market for alternative sources of postpetition financing on similar terms. To the extent the

7

Debtors are unable to find postpetition financing on terms as good as or better than the DIP Facility Agreement, the Lender has committed to providing postpetition financing for the pendency of these chapter 11 cases. To that end, the DIP Note does not mature until a full year-and-a-half after the loan closing date. Under these circumstances, Debtors submit that the DIP Facility Agreement is fair and reasonable, and should be approved.

### The DIP Facility Should be Authorized

20. Approval of the DIP Facility will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including post-petition wages and salaries, as well as utility and critical vendor costs. Unless these expenses are paid, the Debtors will be forced to cease operations, which would likely (i) result in irreparable harm to their business, (ii) deplete going concern value, and (iii) jeopardize the Debtors' ability to maximize value. The credit provided under the DIP Facility Agreement and the use of Cash Collateral will enable the Debtors to continue to satisfy their vendors, service their customers, pay their employees, and operate their businesses in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all stakeholders. The availability of credit under the DIP Facility Agreement will provide confidence to the Debtors' creditors that will enable them and encourage them to continue their relationships with the Debtors. Finally, the implementation of the DIP Facility Agreement will be viewed favorably by the Debtors' vendors, employees, and customers, thereby promoting a successful resolution of these Chapter 11 Cases. Accordingly, the timely approval of the relief requested herein is imperative.

21. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section

503(b)(1) of the Bankruptcy Code, the court may authorize the debtors to obtain credit or incur debt (a) with priority over any and all administrative expense, as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. The Debtors propose to obtain the financing set forth in the DIP Facility Agreement by providing, *inter alia*, superpriority claims, security interests, and liens pursuant to section 364(c)(1), (2), (3) and section 364(d) of the Bankruptcy Code.

22. The Debtors' liquidity needs can be satisfied only if the Debtors are immediately authorized to borrow under the DIP Facility and to use such proceeds to fund their operations. As discussed above, the Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1). The Debtors have not been able to obtain post-petition financing or other financial accommodations from any alternative prospect lender or group of lenders given the emergency nature and short time table of this Chapter 11 case. The rate of interest and the default rate are equal to that of the prepetition financing. The note requires no origination fee and charges no services fees apart from a 4% facility fee that does not become payable until maturity or termination.

23. Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.) 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long

as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); see also In re Funding Sys. Asset Mgmt Corp., 72 B.R. 87 (Bankr. W.D. Pa. 1987); In re Curlew Valley Assocs., 14 B.R. 506, 513-514 (Bankr. D. Utah 1981); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985).

24. Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. See In re Snowshoe Co., 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show it has made a reasonable effort to seek other sources of financing); In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa 1991) (debtor adequately establishing that some degree of priming of loan was necessary if debtor were to obtain funding).

25. Substantially all of the Debtors' assets are encumbered and the Debtors have been unable to procure the required funding absent granting the proposed superpriority claims and liens given the short time frame available to Debtors.[5] Despite their inability to find a suitable alternative lender to the Lender, the DIP Facility Agreement contemplates the DIP Facility Agreement be supplanted while the Debtors continue their efforts to find a non-insider lender willing to provide funding to the Debtors for the pendency of these Chapter 11 bankruptcy cases.

26. The Debtors believe that the DIP Facility Agreement provides the best terms that could be obtained in this current market.

---

[5] The Debtors are seeking to prime only the liens of the Prepetition Lenders, and not any third party liens.

27. The Prepetition Lenders' claim as of the Petition Date, is approximately $52 million representing repayment of notes and accrued interest and if the put right is deemed exercisable, an additional $7 million payment with respect to the XHI Warrants. This claim is secured by first priority liens on substantially all of the Debtors' interests in property and any proceeds therefrom. As described in the Verlin Declaration, the Debtors currently have assets of total market value in excess of $200,000,000.00. Debtors' estimate total current liabilities including Prepetition Lender's claim to be $66,340,000.00.

28. The submitted Approved Budget calls for only $1,600,000.00 to sustain operating and administrative expenses for thirteen weeks at terms no more onerous than those of the Prepetition Lender's. Thus, the Prepetition Lender is substantially oversecured and is not in need of additional assurances.

29. The Debtors submit that the circumstances of this case require the Debtors to obtain financing pursuant to section 364(c) and section 364(d) of the Bankruptcy Code and, accordingly, the DIP Facility Agreement reflects the exercise of their sound business judgment.

30. The terms and conditions of the DIP Facility Agreement are fair and reasonable, and were negotiated in good faith and at arm's length with the advice of separate counsel for the Lender and the Debtors. Accordingly, the Lender and all obligations incurred under the DIP Facility Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

### The Use of Cash Collateral Should Be Approved

31. Under section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use ... in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Debtors require the use of Cash Collateral to fund

their day-to-day operations. Indeed, absent such relief, the Debtors' business will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors. The interests of the Prepetition Lenders in the Cash Collateral will be protected by the adequate protection set forth above. Accordingly, the Debtors' request to use Cash Collateral should be approved.

## The Proposed Adequate Protection Should Be Authorized

32. Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property being used ... or proposed to be used ... by [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985); In re Shaw Indus, Inc., 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3rd Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy") (internal citation omitted).

33. The enormous security and equity cushions that exist here based upon asset value demonstrate that the Prepetition Lender is adequately protected. See In re Continental Airlines, 146 B.R. 536, 539 (Del. Bankr. 1992)("If the creditor is oversecured many courts hold that the equity cushion alone satisfies the adequate protection requirement of section 362(d)(1). See, e.g.,

In re Senior Care Properties, 137 Bankr. 527, 529 (Bankr. N.D. Fla. 1992); In re Lane, 108 Bankr. 6, 8 (Bankr. D. Mass. 1989)"); see also Shaw Indus. v. First Nat'l Bank (In re Shaw Indus.), 300 B.R. 861, 865-66 (W.D. Pa. 2003). Debtors' burn rate as reflected in the proposed budget is modest, even when considering administrative expenses. Thus, operational losses do not threaten to negatively impact the Prepetition Lender's recovery through the Chapter 11 process. Id. The adequate protection proposed herein to protect the Prepetition Lenders' interest in the Prepetition Collateral is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

### The Automatic Stay Should Be Modified on a Limited Basis

34. The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to (i) grant the security interests, liens, and superpriority claims described above with respect to the Lender and the Prepetition Lenders, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the Lender to exercise, upon the occurrence of and during the continuance of an event of default, all rights and remedies under the DIP Facility Agreement; and (iii) implement the terms of the proposed DIP Orders.

35. Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

### Interim Approval Should Be Granted

36. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to

conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to debtor's estate pending a final hearing.

37. Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtors to use Cash Collateral and borrow under the DIP Facility on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estate and all parties in interest, and (b) schedule a hearing to consider entry of a final order.

38. The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors do not have sufficient funds with which to operate their business on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on this Motion, the Debtors will be immediately and irreparably harmed. The availability of interim loans under the DIP Facility will provide necessary assurance to the Debtors' vendors, employees, and customers of their ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' business, to the detriment of all parties in interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtors. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors.

39. The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

40. To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).

### Notice

41. No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases. The Debtors have provided notice of this Motion by facsimile and/or overnight mail to (a) the U.S. Trustee; (b) each of the Debtors' creditors holding the twenty (20) largest unsecured claims on a consolidated basis; (c) the Prepetition Secured Parties; (d) all parties asserting a lien against the Prepetition Collateral; (e) the Lender; (f) the Internal Revenue Service; (g) the Office of the United States Attorney General; (i) the Delaware Secretary of State; and (j) the Delaware Secretary of the Treasury.

WHEREFORE the Debtors respectfully request entry of the Interim DIP Order, substantially in the form of Exhibit B, granting the relief requested herein and such other and further relief as is just.

| | |
|---|---|
| Dated: June 13, 2011<br>Wilmington, DE | **ELLIOTT GREENLEAF**<br><br>*/s/ Neil R. Lapinski*<br>Rafael X. Zahralddin-Aravena (DE No. 4166)<br>Neil R. Lapinski (DE No. 3645)<br>Shelley A. Kinsella (DE No. 4023)<br>John M. Stemerman (DE No. 4510)<br>1105 N. Market Street, Ste 1700<br>Wilmington, DE 19801<br>Telephone: (302) 384-9400<br>Facsimile: (302) 384-9399<br>Email: rxza@elliottgreenleaf.com<br>Email: nrl@elliottgreenleaf.com<br>Email: sak@elliottgreenleaf.com<br>Email: jxs@elliottgreenleaf.com<br><br>*Proposed Counsel to Debtors and Debtors in Possession* |