# Exhibit A

**DEBTOR-IN-POSSESSION**
**REVOLVING LOAN PROMISSORY NOTE**

1,600,000.00                                 Bala Cynwyd, Pennsylvania
                                                       Dated as of June __, 2011

On June 10, 2011 (the "Petition Date"), Xanadoo Holdings, Inc., a Delaware corporation ("XHI" or the "Administrative Borrower"); Xanadoo, LLC, a Delaware limited liability company ("Xanadoo" or a "Borrower"); Pegasus Guard Band, LLC, a Delaware limited liability company ("Pegasus" or a "Borrower"); Xanadoo Spectrum, LLC ,a Delaware limited liability company ("Spectrum" or a "Borrower") and Pegasus Rural Broadband, LLC, a Delaware limited liability company ("Pegasus Rural" or a "Borrower" and collectively, the "Borrowers") filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code"). The Borrowers continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Borrowers have requested that Xanadoo Company, a Delaware corporation (the "Lender") make advances in its discretion from time to time evidenced by this Revolving Loan Promissory Note (as the same may be amended, modified, renewed, restated or supplemented from time to time, this "Note"). The Borrowers intend to utilize such advances to fund their working capital and chapter 11 related requirements. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in Section 19 of this Note.

    1.       Revolving Advances.

        (a)       Subject to the terms and conditions hereof, the Lender shall make available to the Borrowers, from time to time until the Maturity Date, advances (each, a "Revolving Advance" or a "Revolving Loan"). The aggregate amount of Revolving Loans outstanding shall not exceed the Maximum Amount at any time; provided, that prior to the entry of the Final Order, the aggregate amount of Revolving Loans outstanding shall not exceed the Maximum Interim Borrowing at any time. Until the Maturity Date, the Borrowers, subject to the satisfaction of the conditions set forth in Section 2 herein, may from time to time borrow, repay and reborrow under this Section 1, provided, that, the Borrowers shall only be permitted (i) to borrow to pay professional fees and Bankruptcy Court costs set forth in the Approved Budget, (ii) for all items other than professional fees and Bankruptcy Court costs, to borrow an amount equal to the succeeding 1 week projection contained in the Approved Budget in any one borrowing and (iii) for all items other than professional fees and Bankruptcy Court costs, to borrow once every week; provided, further, that the Lender may in its sole discretion lend more often than once every week. Each Revolving Loan shall be made on notice by the Administrative Borrower to the Lender at the address specified in Section 21(a) hereof or such other person or persons designated by the Lender in writing to the Administrative Borrower. Any such notice must be given no later than 11:00 a.m. EST on the date that is at least one (1) Business Day prior to the date of the proposed Revolving Loan; provided, that, the initial Revolving Loan may be made simultaneously with the execution of this Note by the Lender and the Borrowers. Each such notice (a "Notice of Revolving Advance") shall be given in writing (by electronic transmission or overnight courier) specifying (i) the amount of such Revolving

Loan, (ii) the proposed date of such Revolving Loan, which must be a Business Day, and (iii) such other information as may be reasonably required by the Lender. Upon receipt of a Notice of Revolving Advance, subject to the satisfaction of the conditions set forth in this Note, the Lender shall make the proceeds of such Revolving Loan available to the Borrowers on the applicable date of funding of such Revolving Loan by transferring immediately available funds equal to such proceeds to Borrowers' Designated Account. The entire unpaid balance of the Revolving Loans and all other Obligations shall be immediately due and payable in full in immediately available funds on the Maturity Date.

(b)     The Lender shall be entitled to rely upon, and shall be fully protected in relying upon, any Notice of Revolving Advance or similar notice believed by it to be genuine. The Lender may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon has actual knowledge to the contrary.

(c)     The Borrowers shall utilize the proceeds of Revolving Loans to fund working capital requirements and other corporate purposes of the Borrowers in accordance with the Approved Budget (including, without limitation, the payment of any of the costs and expenses of financing the transactions contemplated by this Note that are payable by the Borrowers, and other payments permitted by the terms of this Note, the other Loan Documents, the Bankruptcy Code, the Bankruptcy Court (by court order), the Interim Order and the Final Order).

2.     <u>Certain Conditions to each Revolving Loan</u>. The Lender shall not be obligated to fund any Revolving Loan, if, as of the date thereof:

(a)     the Borrowers shall not have paid any amount then payable hereunder or under any other Loan Document or shall not have performed any of its respective obligations hereunder or under any other Loan Document;

(b)     with respect to any Revolving Loans to be made upon entry of the Interim Order, unless each of the following conditions precedent shall have been satisfied in a manner reasonably satisfactory to the Lender:

(1)     the Borrowers shall have duly executed and delivered this Note;

(2)     the Borrowers shall have delivered corporate resolutions, incumbency certificates and similar documents, in form and substance satisfactory to the Lender with respect to this Note and the other Loan Documents and the transactions contemplated hereby and thereby;

(3)     the Borrowers shall have duly paid any and all fees, costs and expenses then payable hereunder or under any other Loan Document (including, without limitation, the fees, costs and expenses of counsel to the Lender) and shall have fully performed all of its obligations hereunder or under any other Loan Document;

(4)     (i) the Bankruptcy Court shall have entered the Interim Order, and (ii) the Interim Order shall not have been vacated, reversed, modified or

amended without the Lenders' consent, and no appeal of any such order shall have been timely filed or a stay of such order pending appeal shall be presently effective;

        (5)    the Borrowers shall have delivered to the Lender the Approved Budget that is in form and substance satisfactory in the Lender's sole discretion;

        (6)    the Lender shall have received evidence of insurance coverage with respect to the business and operations of the Borrowers as the Lender may reasonably request, in each case, where requested by the Lender, with such endorsements as to the named insureds or loss payees thereunder as the Lender may reasonably request, and providing that such policy may be terminated or canceled (by the insurer or the insured thereunder) only upon 30 days' prior written notice to the Lender and each such named insured or loss payee, together with evidence of the payment of all premiums due in respect thereof for such period as the Lender may reasonably request;

        (7)    the Lender shall have received such depository account, blocked account, lockbox account and similar agreements and other documents, each in form and substance reasonably satisfactory to the Lender, as the Lender may reasonably request with respect to the Borrowers' cash management system;

        (8)    no event or circumstance shall have occurred since the Petition Date that could reasonably be expected to have a Material Adverse Effect, as determined by the Lender in its sole discretion; and

        (9)    no Bankruptcy Court order has been entered (i) authorizing the Borrowers to obtain financing or credit pursuant to section 364 of the Bankruptcy Code from any Person other than the Lender secured by a security interest in any of the DIP Collateral or administrative claim; or (ii) providing adequate protection to any Person under sections 361 through 364 of the Bankruptcy Code by granting a security interest in any of the DIP Collateral or an administrative claim;

        (c)    any representation or warranty by any Borrower contained herein or in any other Loan Document shall be untrue or incorrect as of such date in any material respect, except to the extent that such representation or warranty expressly relates to an earlier date;

        (d)    except as occasioned by the commencement of the Chapter 11 Cases and the actions, proceedings, investigations and other matters related thereto, any event or circumstance having a Material Adverse Effect shall have occurred since the date hereof and the Lender shall have determined not to make any Revolving Loan so long as such Material Adverse Effect is continuing;

        (e)    (i) any Event of Default shall have occurred and be continuing or would result after giving effect to any Revolving Loan; or (ii) any Default shall have occurred and be continuing or would result after giving effect to any Revolving Loan, and the Lender shall have determined not to make any Revolving Loan so long as such Default is continuing; or

(f)     after giving effect to any Revolving Loan, the outstanding principal amount of all Revolving Loans would exceed the lesser of (i) the Maximum Amount, or (ii) the amount then authorized by the Interim Order or the Final Order, as applicable.

The request and acceptance by the Borrowers of the proceeds of any Revolving Loan shall be deemed to constitute, as of the date of such request, acceptance or incurrence, (i) a representation and warranty by each Borrower that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by Borrowers of the granting and continuance of the Lender's Liens, pursuant to the Collateral Documents.

3.     Payment of Principal.  FOR VALUE RECEIVED, Borrowers promise to pay to the Lender, in the manner and at the place hereinafter provided, the unpaid principal amount of all Revolving Loans made by the Lender pursuant to this Note to the Borrowers on the Maturity Date.

4.     Payment of Interest.

(a)     The Borrowers also promise to pay interest on the unpaid principal amount hereof from the date hereof until paid in full, in arrears on each applicable Interest Payment Date, at the rate per annum equal to the Interest Rate.

(b)     If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)     All computations of fees and interest shall be made by the Lender on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by the Lender of an interest rate hereunder shall be final, binding and conclusive on the Borrowers (absent manifest error).

(d)     So long as an Event of Default shall have occurred and be continuing, and at the election of the Lender confirmed by written notice from the Lender to the Borrowers, the interest rate applicable to the Obligations shall be increased by two percentage points (2.00%) *per annum* above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations. Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(e)     Notwithstanding anything to the contrary set forth in this Section 4, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate.

5.     Payments.  All payments of principal and interest in respect of this Note shall be made in Dollars in same day funds to the Lender at the following account:

or to such other account as shall be designated in a written notice delivered by the Lender to the Borrowers at least two Business Days prior to the payment date. Prior to the occurrence and continuation of a Termination Event, each payment made hereunder shall be credited first, to fees and reimbursable expenses of the Lender then due and payable pursuant to any of the Loan Documents; second, to the principal balance of the Revolving Loans until the same has been paid in full; third, to interest then due and payable on the Revolving Loans; fourth, to the principal balance of the Revolving Loans until the same has been paid in full; and fifth, to all other Obligations. After the occurrence and continuation of a Termination Event, each payment made hereunder shall be credited as set forth in the Interim Order or the Final Order, as applicable.

The Borrowers hereby authorize the Lender to, and the Lender may, from time to time, charge the Loan Account of the Borrowers with any amount due and then payable by the Borrowers under any Loan Document; provided that the Lender provides contemporaneous notice to the Borrowers of such charge. The Borrowers agree that the Lender shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing. Any amount charged to the Loan Account of the Borrowers shall be deemed a Revolving Loan hereunder made by the Lender to the Borrowers. The Borrowers confirm that any charges that the Lender may so make to the Loan Account of the Borrowers as herein provided will be made as an accommodation to Borrowers and solely at the Lender's discretion.

6. <u>Optional Prepayments</u>. The Borrowers shall have the right at any time and from time to time to prepay the principal of this Note in whole or in part (without premium or penalty).

7. <u>Mandatory Prepayments</u>.

(a) If at any time the aggregate outstanding principal amount of the Revolving Loans exceed the Maximum Amount or the amount permissible pursuant to an order of the Bankruptcy Court, the Borrowers shall immediately repay the aggregate outstanding Revolving Loans to the extent required to eliminate such excess.

(b) Immediately upon receipt by any Borrower of cash proceeds of any asset disposition, unless the Lender agrees otherwise, such Borrower shall contribute such proceeds to the Borrowers and the Borrowers shall prepay the Revolving Loans in an amount equal to 100% of such proceeds, net of (A) reasonable commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrowers in connection therewith (in each case, paid to non-affiliates), (B) transfer or sales taxes, (C) and other payments from the proceeds as authorized by the Bankruptcy Court and approved by the Lender in writing, and (D) amounts required to be applied to the repayment of debt secured by such assets sold. Any such prepayment shall be applied in accordance with Section 7(f).

(c)     If any Borrower issues Stock or any debt securities, no later than the Business Day following the date of receipt of the cash proceeds thereof, the Borrowers shall prepay the Revolving Loans in an amount equal to 100% of such proceeds, net of underwriting discounts, reasonable commissions and other reasonable costs paid to non-affiliates in connection therewith. Any such prepayment shall be applied in accordance with Section 7(f).

(d)     Upon the receipt by any Borrower of any Extraordinary Receipts, the Borrowers shall prepay the outstanding principal of the Revolving Loans in an amount equal to 100% of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts. Any such prepayment shall be applied in accordance with Section 7(f).

(e)     At the beginning of each Thursday (or the next Business Day if such Thursday is not a Business Day), the Borrowers shall transfer to the Lender all funds on deposit in the Borrowers' Sweep Account to be applied in accordance with Section 7(f).

(f)     <u>Application of Certain Mandatory Prepayments</u>. Any prepayments made by the Borrowers pursuant to Sections 7(b) through (e) above shall be applied pursuant to Section 5 hereof. The Maximum Amount shall be permanently reduced by the amount of all prepayments made pursuant to Section 7(b), (c), or (d).

(g)     <u>No Implied Consent</u>. Nothing in this Section 7 shall be construed to constitute the Lender's consent to any transaction that is not permitted by other provisions of this Note or the other Loan Documents.

8.     <u>Fee</u>. Borrowers shall pay to the Lender a nonrefundable financing fee (the "Facility Fee") equal to 4% of the Maximum Amount payable on the Maturity Date.

9.     <u>Indemnity</u>.

(a)     The Borrowers, jointly and severally, shall indemnify and hold harmless the Lender and each of their respective affiliates, members, officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "Indemnified Liabilities"); provided, that the Borrowers shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS**

**DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

          10.    <u>Adjustments for Withholding, Capital Adequacy Etc.</u>  Notwithstanding anything to the contrary contained herein, all payments by the Borrowers under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities, including interest, penalties and additions to tax with respect thereto, excluding taxes imposed on the net income of the Lender by the jurisdiction in which such Lender is organized or has its principal lending office (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "<u>Taxes</u>").  If the Borrowers shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note, then (i) the amount payable shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) each Lender receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (ii) the Borrowers shall make such deductions or withholdings, and (iii) the Borrowers shall immediately pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

          If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from the Borrowers (but excluding taxation on the overall net income of any Lender)), or any change therein or in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Lender with respect to this Note or to increase the cost to the Lender of making or maintaining amounts available under this Note, the Borrowers agree to pay the Lender such additional amount or amounts as will compensate the Lender on an after-tax basis for such reduction or increase.

          The Borrowers agree to immediately pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "<u>Other Taxes</u>") which arise from any payment made by the Borrowers under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

          The Borrowers shall indemnify the Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable by the Borrowers hereunder) paid by the Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Taxes or Other Taxes, whether or not they were correctly or legally asserted.  Payment under this indemnification shall be made upon demand.  A certificate as to the amount of such Taxes or Other Taxes submitted to the Borrowers by the Lender shall be conclusive evidence, absent manifest error, of the amount due from the Borrowers to the Lender.

Borrowers shall furnish to the Lender the original or a certified copy of a receipt evidencing payment of Taxes or Other Taxes made by the Borrowers within thirty (30) days after the date of any payment of Taxes or Other Taxes.

11.  Securitization.  The Lender may at any time pledge or grant a security interest in all or any portion of its rights under this Note, the other Loan Documents and the Revolving Loans made by it as collateral security to secure obligations of the Lender, affiliates of the Lender or funds or accounts managed by the Lender or an affiliate of the Lender.

12.  Priority of Obligations and the Lender's Liens.  To secure all of the Borrowers' Obligations now existing or hereafter arising, the Lender is granted (i) the Postpetition Liens in the DIP Collateral, and (ii) the DIP Superpriority Claim.  The priority of the Postpetition Liens and the DIP Superpriority Claim are set forth in the Interim Order or Final Order (as applicable).

13.  Further Assurances.  Each Borrower agrees that it shall, at the Borrowers' expense and upon request of the Lender, duly execute and deliver or cause to be duty executed and delivered, to the Lender such further instruments and do and cause to be done such further acts as may be reasonable and necessary to carry out more effectively the provisions and purposes of this Note or any other Loan Document, including, upon the Lender's written request and in form and substance reasonably satisfactory to the Lender, security agreements, UCC-1 financing statements and other Collateral Documents granting to the Lender first priority Liens in the DIP Collateral to secure the Obligations.

14.  Reports and Notices.

(a)  The Borrowers hereby agree to deliver to the Lender on a weekly basis, cash receipts and a report of disbursements of the Borrowers as at the end of each weekly period ending after the Closing Date.

(b)  The Borrowers hereby agree to deliver to the Lender as soon as available, and in any event within 45 days after the end of each fiscal month of the Borrowers commencing with the first fiscal month of the Borrowers ending after the date hereof, internally prepared consolidated and consolidating balance sheets and consolidated and consolidating statements of operations and retained earnings as at the end of such fiscal month, all in reasonable detail and certified by an authorized officer of the Borrowers as fairly presenting, in all material respects, the financial position of the Borrowers as at the end of such fiscal month and the results of operations, retained earnings and cash flows of the Borrowers for such fiscal month, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements furnished to the Lender, subject to normal year-end adjustments and the absence of any footnotes.

(c)  The Borrowers hereby agree to deliver to the Lender as soon as available, and in any event within 30 days after the end of each fiscal quarter of the Borrowers commencing with the first fiscal month of the Borrowers ending after the date hereof, an update to the Approved Budget, in form and substance satisfactory to the Lender in its sole and absolute discretion.

(d)     The Borrowers hereby agree to deliver, or cause to be delivered to the Lender, each of the following, which shall be in form and detail reasonably acceptable to the Lender:

(1)     immediately after any officer of any Borrower obtains knowledge of the occurrence of any Default or Event of Default under any Loan Document, notice of such occurrence, together with a detailed statement by a responsible officer of the Borrowers of the steps being taken by Borrowers to cure the effect of such Default or Event of Default;

(2)     immediately upon any officer of the Borrowers obtaining knowledge thereof, notice of any loss of or material damage to any DIP Collateral or of any substantial adverse change in any DIP Collateral or the prospect of payment thereof, or of the occurrence or existence of any other event or circumstance which has had or could reasonably be expected to have a Material Adverse Effect;

(3)     promptly upon receipt, or if filed by the Borrowers, promptly upon filing, all motions, notices, reports, applications, objections, responses or other papers filed or served in the Chapter 11 Cases;

(4)     (A) promptly after submission to any governmental authority, (I) all documents and information furnished to such governmental authority in connection with any investigation of any Borrower, other than routine inquiries by such governmental authority, and (II) copies of any periodic or special reports filed by the Borrowers with any governmental authority, other than routine reports filed in the ordinary course of business, and (B) as soon as available and in any event within five days of the execution, receipt or delivery thereof, copies of material notices and other material communications received from or sent to any governmental authority which specifically relate to any Borrower; and

(5)     promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Borrower as the Lender may reasonably request.

(e)     The Borrowers authorize the Lender to communicate directly with their independent certified public accountants and advisors and authorizes and shall instruct those accountants and advisors to disclose and make available to the Lender as reasonably requested by the Lender any and all financial statements and other supporting financial documents, schedules and information relating to the Borrowers or any of their respective subsidiaries (including copies of any issued management letters) with respect to the business, financial condition and other affairs of the Borrowers or any of their respective subsidiaries, which information the Lender, and their respective officers, directors, members, partners, shareholders, employees, professionals and representatives shall treat as confidential.

15.     Affirmative Covenants.

The Borrowers agree that:

(a)     The Borrowers will keep accurate books of record and account pertaining to the DIP Collateral and pertaining to the Borrowers' business and financial condition and such other matters as the Lender may from time to time reasonably request, in which true and complete entries will be made in accordance with GAAP and, upon request of the Lender, will permit any officer, employee, attorney or accountant or agent of the Lender to audit, review, make extracts from or copy, at the Borrowers' expense, any and all corporate and financial and other books and records of the Borrowers at all times during ordinary business hours, to send and discuss with account debtors and other obligors requests for verification of amounts owed to the Borrowers, and to discuss the Borrowers' affairs with any of their directors, officers, employees, attorneys, or accountants; provided, that the Lender shall notify the Borrowers in advance of any anticipated communications with accountants.  The Borrowers will permit the Lender, or any of its respective officers, employees, accountants, attorneys or agents, to examine and inspect any DIP Collateral or any other property of the Borrowers at any time during ordinary business hours and, so long as no Event of Default has occurred and is continuing, upon reasonable prior notice and in a manner not to disrupt the operation of the Borrowers' business.

(b)     (i) The Borrowers will, except as disclosed to and agreed by the Lender, (A) comply with all requirements of law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (B) use and keep the DIP Collateral, and require that others use and keep the DIP Collateral, only for lawful purposes, without violation of any federal, state or local law, statute or ordinance, and (ii) the Borrowers will obtain, maintain in effect and comply with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted.

(c)     The Borrowers will pay or discharge, when due (except for any pre-petition taxes and then in conjunction with the confirmation of a plan or Bankruptcy Court order), (i) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Borrowers (including, without limitation, the DIP Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto (ii) all federal, state and local taxes required to be withheld by it, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of the Borrowers.

(d)     (i) The Borrowers will keep and maintain the DIP Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) and will from time to time replace or repair any worn, defective or broken parts, (ii) the Borrowers will defend the DIP Collateral against all claims or demands of all Persons (other than the Lender and Prepetition Senior Secured Lender) claiming the DIP Collateral or any interest therein, and (iii) the Borrowers will keep all DIP Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances.

(e)     Each Borrower will conduct its business and affairs without infringement of or interference with any intellectual property of any other Person in any material respect and shall comply in all material respects with the terms of the written agreements governing such Borrower's use of any intellectual property licenses.

(f)     The Borrowers will obtain and at all times maintain insurance with responsible and reputable insurers, in such amounts and against such risks as may from time to time be reasonably required by the Lender, but in all events in such amounts and against such risks as is usually carried by companies engaged in a similar business and owning similar properties in the same general areas in which the Borrowers operate. Without limiting the generality of the foregoing, the Borrowers will at all times keep all tangible DIP Collateral insured against risks of fire (including so-called extended coverage), theft, collision (for DIP Collateral consisting of motor vehicles) and such other risks and in such amounts as the Lender may request, with any loss payable to the Lender to the extent of its interest, and all policies of such insurance shall contain a loss payable endorsement in favor of the Lender in form and substance reasonably acceptable to the Lender. All policies of liability insurance required hereunder shall name the Lender as an additional insured.

(g)     Subject to the actions of the Bankruptcy Court in connection with the Chapter 11 Cases, the Borrowers will preserve and maintain their existence and all of their rights, privileges and franchises necessary or desirable in the normal conduct of its business and shall conduct their business in an orderly, efficient and regular manner.

(h)     The Borrowers shall at all times operate their business in a manner consistent with the Approved Budget except to the extent any variance from the Approved Budget has been approved in advance by the Lender in their sole discretion.

(i)     The Borrowers shall comply with all terms, conditions, requirements and obligations set forth in the Interim Order or Final Order (as applicable).

16.     <u>Negative Covenants</u>.

The Borrowers agree that, without the prior written consent of the Lender:

(a)     The Borrowers shall not assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person, except the endorsement of negotiable instruments by the Borrowers for the deposit or collection or similar transactions in the ordinary course of business.

(b)     The Borrowers shall not consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, the Interim Order or the Final Order.

(c)     The Borrowers shall not cancel any claim or debt owing to it, except for reasonable consideration negotiated on an arm's-length basis and in ordinary course of its business consistent with past practices.

(d)     During each month, the Borrowers shall not permit the outstanding Revolving Loans at any time to exceed (i) the Maximum Amount, or (ii) the amount then authorized by the Interim Order or the Final Order (as applicable).

17.     <u>Events of Default; Rights and Remedies</u>. Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court,

the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

A.     The Borrowers (i) shall fail to make any payment of principal or interest on, or fees owing in respect of the Revolving Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Lender for any expense reimbursable hereunder or under any other Loan Document within three (3) Business Days following the Lender's demand for such reimbursement or payment.

B.     Any Borrower shall fail or neglect to perform, keep or observe any of the provisions of (i) Sections 14(d)(1), 14(d)(2), 15(b), 15(c), 15(d), 15(e), 15(f), 15(h) or 16 of this Note, or (ii) Sections 14 (other than Sections 14(d)(1) and 14(d)(2)) or 15(a) of this Note and such failure shall remain uncured for a period of three (3) Business Days after the earlier of the date a senior official of any Borrower becomes aware of such failure and the date written notice of such default shall have been given by the Lender to such Borrower.

C.     Any Borrower shall fail or neglect to perform, keep or observe any other provision of this Note or any of the other Loan Documents (other than any provision embodied in or covered by any other clause of this Section 17) and the same, if capable of being remedied, shall remain unremedied for two (2) Business Days after the earlier of the date a senior officer or any Borrower becomes aware of such failure and the date written notice of such default shall have been given by the Lender to such Borrower.

D.     Any representation or warranty herein or in any other Loan Document or in any written statement, report, financial statement or certificate made or delivered to the Lender by any Borrower is untrue or incorrect in any material respect as of the date when made or deemed made.

E.     The occurrence of any postpetition judgments, liabilities or events that remain unabated and, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

F.     Any provision of any Loan Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or any Borrower shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any Loan Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any Loan Document shall cease to be a valid and perfected first priority Lien (except as otherwise permitted herein or therein) in any of the DIP Collateral purported to be covered thereby.

G.     Any event occurs, whether or not insured or insurable, as a result of which revenue-producing activities cease or are substantially curtailed at facilities of any Borrower generating more than five percent (5%) of the Borrowers' consolidated revenues for the fiscal year preceding such event and such cessation or curtailment continues for more than thirty (30) days.

H.     There shall be a material adverse change in the business, assets, operations or financial condition of the Borrowers, taken as a whole, other than those customarily caused by the filing of a Chapter 11 Case or those as a result of the Borrowers failing to comply with the FCC's substantial service requirements with respect to BRS and EBS licenses and leases that may be held by the Borrowers.

I.     A Material Adverse Deviation shall occur without the Lender's consent, provided, however, that the Borrowers may utilize savings in any one line item (other than for Professional Fees) to exceed the permitted variance in another line item (other than for Professional Fees) to the extent the Borrowers determine, in good faith, that such use is necessary to avoid harm to the Borrowers' business and estates.

J.     Any Borrower shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or capital Stock of, or otherwise combine with or acquire, any Person.

K.     The Final Order is not entered by the Court on or before August 26, 2011.

L.     A Termination Event shall occur.

If any Event of Default shall have occurred and be continuing, then the Lender may, upon written notice to the Administrative Borrower: (i) terminate this Note and the Revolving Loan facility contemplated hereby with respect to further Revolving Loans, (ii) declare all or any portion of the Obligations, including without limitation, all or any portion of any Revolving Loan or the Facility Fee, to be forthwith due and payable and (iii) exercise any rights and remedies under the Loan Documents, the Interim Order or the Final Order (as applicable) or at law or in equity.

Except as otherwise provided for in this Note or by applicable law, each Borrower waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Lender on which Borrowers may in any way be liable, and hereby ratifies and confirms whatever the Lender may do in this regard; (b) all rights to notice and a hearing prior to the Lender's taking possession or control of, or the Lender's replevy, attachment or levy upon, the DIP Collateral or any bond or security that might be required by any court prior to allowing the Lender to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time or from time to time, without notice to the Borrowers or to any other Person, any such notice being hereby expressly waived, to offset and to appropriate and to apply any and all balances held by it at any of its offices for the account of the Borrowers (regardless of whether such balances are then due to the

Borrowers) and any other properties or assets at any time held or owing by the Lender to or for the credit or for the account of the Borrowers against and on account of any of the Obligations that are not paid when due.

To the extent permitted by law and subject in all respects to the terms of the Interim Order or the Final Order (as applicable), the Lender's sole duty with respect to the custody, safekeeping and physical preservation of the DIP Collateral in its possession, under section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as the Lender deals with similar securities and property as a secured lender in other transactions. The Lender's duty of care with respect to DIP Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if it exercises reasonable care in the selection of the bailee or other third person, and the Lender need not otherwise preserve, protect, insure or care for any DIP Collateral, and the Lender shall not be obligated to preserve any rights any Borrower may have against prior parties.

18. <u>Reference Agreements</u>. This Note evidences the Revolving Loans that may be made to the Borrowers from time to time in the aggregate principal amount outstanding of up to $1,600,000.00 and is issued pursuant to and entitled to the benefits of the Interim Order and Final Order (as applicable) to which reference is hereby made for a more complete statement of the terms and conditions under which the Revolving Loans evidenced by this Note are made and are to be repaid.

19. <u>Definitions</u>. The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"<u>Accounts</u>" means all of each Borrower's now owned and hereafter acquired "accounts" (as defined in the UCC) whether owned or acquired prior to or after the Petition Date and all other rights to payment for goods sold or leased or for services rendered that are not evidenced by an Instrument or Chattel Paper, whether or not any such rights to payment have been earned by performance.

"<u>Administrative Borrower</u>" shall have the meaning given such term in the recital to this Note.

"<u>Approved Budget</u>" means a detailed budget which sets forth projected cash receipts, sales and cash disbursements (by line item) on a weekly basis for the time period from and including the Petition Date through December 9, 2011, a copy of which is attached hereto as <u>Exhibit A</u>, as the same may be modified or supplemented from time to time by written agreement of the Lender and the Borrowers.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

"<u>Borrower</u>" or "<u>Borrowers</u>" shall have the meaning given such term in the recital to this Note.

"Business Day" means any day other than a Saturday, Sunday or legal holiday under the laws of the Commonwealth of Pennsylvania or any other day on which banking institutions located in the Commonwealth of Pennsylvania authorized or required by law or other governmental action to close.

"Chapter 11 Case" and "Chapter 11 Cases" shall have the respective meanings given such terms in the recital to this Note.

"Collateral Documents" shall mean any agreement entered into pursuant to Section 13 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations, including the Interim Order or the Final Order (as applicable).

"Commitment" means the Lender's commitment to make the Revolving Loans to the Borrowers in the principal amount set forth on the signature page to the Note, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (ii) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (iii) any obligation of such Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (C) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(d) of this Note.

"Designated Account" shall mean account number 8502044464, ABA routing number 031000053 maintained by the Borrowers with PNC Bank or such other deposit account of the Borrowers (located in the United States) that has been designated as such in writing by the Borrowers to the Lender.

"DIP Collateral" shall have the meaning set forth in the Interim Order or the Final Order (as applicable).

"DIP Superpriority Claim" shall have the meaning set forth in the Interim Order or the Final Order (as applicable).

"Dollars" or "$" shall mean lawful currency of the United States of America.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"Event of Default" shall have the meaning given such term in Section 17 of this Note.

"Extraordinary Receipts" means any cash received by any Borrower not in the ordinary course of business (and not consisting of proceeds described Sections 7(b) and (c) hereof), including, without limitation, (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments and (vii) any purchase price adjustment received in connection with any purchase agreement.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to the Lender, together with all extensions, modifications and amendments thereto, authorizing the Borrowers to obtain credit, incur Indebtedness, and grant Liens under this Note and the other Loan Documents, all as set forth in such order.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Indebtedness" shall mean, without duplication, with respect to any Person, (i) all indebtedness of such Person for borrowed money; (ii) all obligations of such Person for the deferred purchase price of property or services (other than trade payables, payables to vendors or other account payables incurred in the ordinary course of such Person's business and not past due for more than 90 days after the date such payable was created); (iii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (iv) all obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or the Lender thereunder are limited to repossession or sale of such property; (v) all capitalized lease obligations of such Person; (vi) all obligations and liabilities, contingent or

-16-

otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (vii) all obligations and liabilities, calculated on a basis reasonably satisfactory to the Lender and in accordance with accepted practice, of such Person under interest rate or currency swaps and other derivatives; (viii) all Contingent Obligations; (ix) all other items which, in accordance with GAAP, would be included as liabilities on the liability side of the balance sheet of such Person; and (x) all obligations referred to in clauses (i) through (ix) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer.

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Interim Order" shall mean the Order of the Bankruptcy Court (i)(a) authorizing the Borrowers to use cash collateral and grant adequate protection to the Prepetition Senior Secured Lenders and (b) incur post-petition secured indebtedness, (ii) granting security interest and super-priority claims pursuant to 11 U.S.C. Sections 364(c) and (d), (iii) granting adequate protection pursuant to U.S.C. 361 and 363, (iv) modifying automatic stay and (v) setting final hearing.

"Interest Payment Date" shall mean the first Business Day of each month to occur while any Revolving Loans are outstanding; provided that, in addition to the foregoing, each of (x) the date upon which all of the Revolving Loans have been paid in full and (y) the Maturity Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued hereunder; provided, further, however, that, all of such interest shall be paid-in-kind by being added to the outstanding principal balance of such Revolving Loans. Any interest to be capitalized shall be capitalized on the first Business Day of each month, commencing on the first Business Day of the month following the month in which such Revolving Loan is made and added to the then outstanding principal amount of the Revolving Loans and, thereafter, shall bear interest as provided hereunder as if it had originally been part of the outstanding principal of the Revolving Loans.

"Interest Rate" means a rate of interest equal to 12.5%.

"Inventory" means, with respect to any Person, all goods and merchandise of such Person, including, without limitation, all raw materials, work-in-process, packaging, supplies, materials and finished goods of every nature used or usable in connection with the shipping, storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired, and all such other similar property the sale or other disposition of which would give rise to an account receivable or cash.

"Lenders" shall have the meaning given such term in the recital to this Note.

"Lien" shall mean any (i) mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or

encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction) and (ii) Postpetition Lien (as defined in the Interim Order or the Final Order, as applicable).

"Loan Account" means an account maintained hereunder by the Lender on its books of account at the Payment Office, and with respect to the Borrowers, in which the Borrowers will be charged with all Revolving Loans made to, and all other Obligations incurred by, the Borrowers.

"Loan Documents" shall mean this Note, the Interim Order, the Final Order, the Collateral Documents and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, the Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Borrower, or any employee of any Borrower, and delivered to the Lender in connection with this Note or the transactions contemplated thereby. Any reference in this Note or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Material Adverse Deviation" shall mean (i) the aggregate disbursements by the Borrowers (other than for Professional Fees) for any Approved Budget period shall exceed, without the prior written consent of the Lender, the aggregate amount budgeted for such period as set forth in the Approved Budget by more than a factor of ten percent (10%) of such aggregate amount or (ii) the Borrowers' expenditures (other than for Professional Fees) shall exceed the Approved Budget amount for any disbursement line item by more than a factor of ten percent (10%) of the budgeted amount for such line item.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business assets or properties or condition (financial or otherwise) of any Borrower or of the Borrowers taken as a whole (other than those resulting solely from the commencement of the Chapter 11 Cases), (ii) the ability of any Borrower to perform any of its obligations under any Loan Document to which it is a party (other than those resulting solely from the commencement of the Chapter 11 Cases), (iii) the legality, validity or enforceability of this Note or any other Loan Document, (iv) the rights and remedies of the Lender under any Loan Document, or (v) the validity, perfection or priority of a Lien in favor of the Lender on any of the DIP Collateral.

"Maturity Date" means the earliest of: (i) the close of business on December 11, 2012; or (ii) a Termination Event.

"Maximum Amount" shall, as of any date of determination, be an amount equal to $1,600,000.00.

"Maximum Interim Borrowing" shall have the meaning set forth in the Interim Order.

"Notice of Revolving Advance" shall have the meaning given such term in Section 1 of this Note.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by the Borrowers to the Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under this Note or any of the other Loan Documents. This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to the Borrowers under this Note or any of the other Loan Documents.

"Other Taxes" shall have the meaning given such term in Section 10 of this Note.

"Payment Office" means such office or offices of the Lender as may be designated in writing from time to time by the Lender to the Administrative Borrower.

"Permitted Encumbrances" shall mean the following encumbrances: (a) Liens for taxes or assessments or other governmental charges not yet due and payable; (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing use of utilities, bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Borrower is a party as lessee made in the ordinary course of business; (d) inchoate and unperfected workers', mechanics' or similar liens arising in the ordinary course of business, so long as such Liens attach only to equipment, fixtures or real estate; (e) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Borrower is a party; (f) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (g) purchase money security interests and capital leases incurred prior to the Petition Date; (h) Liens pursuant to and permitted under the Prepetition Loan Agreement and (i) the Liens in favor of the Lenders securing the Obligations.

"Permitted Priority Encumbrances" shall mean all Permitted Encumbrances other than the Liens permitted under clauses (a), (d) and (h) of the definition of the term "Permitted Encumbrances."

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall have the meaning given such term in the recital to this Note.

"Postpetition Liens" shall have the meaning set forth in the Interim Order or the Final Order (as applicable).

"Prepetition Indebtedness" shall mean all Indebtedness of the Borrowers incurred or assumed prior to the Petition Date.

"Prepetition Indebtedness Amount" shall mean an amount equal to the Prepetition Indebtedness reduced by all payments applied to the Prepetition Indebtedness after the Petition Date.

"Prepetition Loan Agreement" means that certain Securities Purchase Agreement, dated as of May 17, 2007, by and among XHI, the Borrower Subsidiaries of XHI, and Beach Point Capital Management LP (as successor to Post Advisory Group, LLC, solely in its capacity as collateral agent for the noteholders thereunder and certain funds or accounts managed or advised by Beach Point Capital Management LP, as amended by that certain Amendment No. 1 to Securities Purchase Agreement dated as of November 25, 2008, as amended, modified or supplemented through the Petition Date.)

"Prepetition Senior Secured Lenders" means the lenders party to the Prepetition Loan Agreement.

"Professional Fees" shall have the meaning set forth in the Interim Order or the Final Order (as applicable).

"Related Fund" shall mean, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"Reorganization Plan" means a plan of reorganization proposed by any Borrower or any other Person in the Chapter 11 Cases.

"Revolving Loan" shall have the meaning given such term in Section 1 of this Note.

"Stock" shall mean all shares, options, warrants, general or limited partnership interests or other equivalents (regardless of how designated) of or in a corporation, partnership or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act).

"Stockholder" shall mean with respect to any Person, each holder of Stock of such Person.

"Sweep Account" shall have the meaning specified therefor in the Motion of Debtors for Order Under 11 U.S.C. §§ 105, 363, 503(b), 1107 and 1108 authorizing (I) maintenance of existing bank accounts, (II) continued use of existing business forms, (III),

continued use of existing cash management system and (IV) providing administrative priority status to postpetition intercompany claims and (V) waiver of Section 345(b) deposit and investment requirements filed by the Borrowers.

"Taxes" shall have the meaning given such term in Section 10 of this Note.

"Termination Event" shall have the meaning given such term in the Interim Order or the Final Order, as applicable.

"UCC" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of Pennsylvania or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the DIP Collateral, the Uniform Commercial Code (or any successor statute) of such state.

20. Representations and Warranties. Each Borrower represents as follows:

(a)     each Borrower is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or formation, except as affected by the commencement of the Chapter 11 Cases;

(b)     the execution and delivery of this Note and the other Loan Documents and the performance by each Borrower of each Borrower's obligations hereunder and under the other Loan Documents are within its corporate or limited liability company powers, have been duly authorized by all necessary corporate or limited liability company action of each Borrower and its respective members, shareholders and affiliates, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of each Borrower's or any of its respective shareholders or affiliates corporate charter or by-laws or other organizational documents or of any agreements binding upon or applicable to each Borrower or any of its respective affiliates or any of each Borrower's properties;

(c)     the Chapter 11 Cases have been duly authorized by all necessary legal and limited liability company action by or on behalf of each Borrower and have been duly and properly commenced;

(d)     this Note and each other Loan Document is the legal, valid and binding obligation, enforceable against each Borrower in accordance with its terms except as limited by equitable principles relating to enforceability;

(e)     each Borrower has good and marketable title to, or valid leasehold or contractual interests in, all of its property and assets; none of the properties and assets of each Borrower are subject to any Liens other than Permitted Encumbrances, and there are no facts, circumstances conditions that may result in any Liens other than Permitted Encumbrances;

(f)     no information contained in this Note, any of the other Loan Documents, any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of each Borrower to the Lender pursuant to the terms of this Note, any Loan Document or otherwise contains or will

contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. The Liens granted to the Lenders pursuant to the Collateral Documents will at all times be fully perfected first priority Liens in and to the DIP Collateral described therein, subject, as to priority, only to Permitted Priority Encumbrances;

(g)     except for proceedings in the Chapter 11 Cases, in connection with the entry of the Final Order, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of each Borrower, threatened against any Borrower before any governmental authority or before any arbitrator or panel of arbitrators that (a) challenges such Borrower's right or power to enter into or perform any of its obligations under the Loan Documents to which it is a party, or the validity or enforceability of any Loan Document or any action taken thereunder or (b) has a reasonable risk of being determined adversely to each Borrower and that, if so determined, could have a Material Adverse Effect;

(h)     to the best of each Borrower's knowledge, each of its accounts, contracts, contract rights, tangible chattel paper, intangible or electronic chattel paper, documents, instruments, general intangibles, supporting obligations and other rights, remedies, obligations or other intangibles of any kind (i) is and will be genuine, and in all respects what it purports to be, and is not and will not be evidenced by a judgment, an instrument or chattel paper (unless such judgment shall have been assigned to the Lender in such manner as the Lender shall deem necessary or appropriate to perfect and preserve its first priority security interest therein and unless, if so requested by the Lender, such instrument shall have been endorsed and delivered to or at the direction of the Lender and, in the case of tangible chattel paper, if so requested by the Lender, delivered to the Lender); (ii) represents and will represent a bona fide transaction completed or in progress in accordance with the terms and provisions contained in the invoices and purchase orders relating thereto, and the underlying transactions giving rise thereto do not and will not in any way violate any requirements of law; and (iii) is and will be in the amount shown on each Borrower's records, which amount is and will be actually and absolutely owing to each Borrower and not contingent or subject to any rights of set-off or reduction for any reason other than regular discounts, credits or adjustments allowed by each Borrower in the ordinary course of its business;

(i)     except as disclosed to the Lender, all Federal, state and local tax returns and other reports required by applicable law to be filed by the Borrowers have been filed, or extensions have been obtained, and all taxes, assessments and other governmental charges imposed upon any Borrower or any property of any Borrower and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP;

(j)     the execution, delivery and performance of this Note and the other Loan Documents will not (immediately or with the giving of notice or passage of time, or both) (i) violate, as applicable, the certificate of formation, articles or certificate of incorporation or formation, bylaws or operating agreements, articles or certificate of organization, operating agreement, or other organizational or governing documents of any Borrower, or violate any law

or regulation; or (ii) result in the creation or imposition of any Lien upon any of the property of any Borrower, except in favor of the Lender; and

(k)     except for the Chapter 11 Cases and other matters previously disclosed to the Lender, there is no order, notice, claim, litigation, proceeding or investigation pending or threatened against or in any way affecting (i) any Borrower, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect or (ii) this Note or any other Loan Document.

21.     Miscellaneous.

(a)     All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, telecopied, cabled or delivered as follows: if to the Borrowers, at 225 City Avenue, Suite 100, Bala Cynwyd, PA, 19096, Attention: Howard E. Verlin, with a copy to Rafael X. Zahralddin, Elliott Greenleaf, 1105 Market Street, Suite 1700, Wilmington, DE19801; and if to the Lender, at 225 City Avenue, Suite 100, Bala Cynwyd, PA 19096, Attention: Scott A. Blank, with a copy to Drinker Biddle & Reath LLP, One Logan Square, Suite 2000, Philadelphia, PA 19103, Attention: Michael Jordan; or in each case at such other address as shall be designated by the Lender or the Borrowers. All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or when sent by fax be effective when confirmation is received.

(b)     The Borrowers shall reimburse the Lender for all out-of-pocket expenses incurred in connection with the negotiation and preparation of the Loan Documents and the obtaining of approval of the Loan Documents by the Bankruptcy Court. The Borrowers shall reimburse the Lender for all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with:

(1)     any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the Loan Documents or advice in connection with the administration of the Revolving Loans made pursuant hereto or its rights hereunder or thereunder;

(2)     the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 case, attendance at meetings related to the Chapter 11 Cases and any subsequent Chapter 7 case, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 case;

(3)     any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Lender, the Borrowers or any other Person, and whether as a party, witness or otherwise) in any way relating to the DIP Collateral, any of the Loan Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against the Borrowers or any other Person that may be obligated to the Lender by virtue of the Loan

Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Revolving Loans during the pendency of one or more Events of Default;

(4)    any attempt to enforce any remedies of the Lender against any or all of the Borrowers or any other Person that may be obligated to the Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Revolving Loans during the pendency of one or more Events of Default;

(5)    any work-out or restructuring of the Revolving Loans during the pendency of one or more Events of Default; and

(6)    any efforts to (i) monitor the Revolving Loans or any of the other Obligations, (ii) evaluate, observe or assess any of Borrowers or its respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the DIP Collateral;

including, as to each of clauses (1) through (6) above, all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 21(b), all of which shall be payable, on demand, by the Borrowers to the Lender. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram or telecopy charges; secretarial overtime charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services. All expenses incurred by the Lender shall receive super priority administrative expense status per Section 364(c)(1) of the Bankruptcy Code.

(c)    No failure or delay on the part of the Lender or any other holder of this Note (or any portion thereof) to exercise any right, power or privilege under this Note and no course of dealing between the Borrowers and the Lender shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Lender would otherwise have. No notice to or demand on the Borrowers in any case shall entitle the Borrowers to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Lender to any other or further action in any circumstances without notice or demand.

(d)    The Borrowers and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind except as otherwise expressly provided

herein and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)     If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)     **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF BORROWERS AND THE LENDER HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF PENNSYLVANIA), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(g)     **THE BORROWERS AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREES TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE LENDERS'/BORROWERS' RELATIONSHIP THAT IS BEING ESTABLISHED.** The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims. The Borrowers and, by their acceptance of this Note, the Lenders and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE.** In the event of litigation, this provision may be filed as a written consent a trial by the court.

(h)     Each Borrower hereby waives the benefit of any statute or rule of law or judicial decision which would otherwise require that the provisions of this Note be construed or interpreted most strongly against the party responsible for the drafting thereof.

(i)     The Borrowers shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of the Lender. Subject to registration in accordance with paragraph (m) of this Section 21, the Lender may assign to one or more entities all or any part of, or may grant participation's to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have it were the Lender hereunder. The Lender shall

notify the Borrowers of any assignment granted hereunder, provided, however, that the Lender is not required to notify the Borrowers in the event that (1) the assignment is to an affiliate of a Lender or a Related Fund of a Lender or (2) the transfer of the interest is in the form of a participation.

(j)     No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrowers and the Lender.

(k)     Any provision of this Note which is prohibited or unenforceable shall be ineffective to the extent such prohibition or unenforceability without invalidating the remaining provisions hereof.

(l)     This Note, the other Loan Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other Loan Document shall be binding upon each Borrower, the estate of each Borrower, and any trustee or successor in interest of any Borrower in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Note and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Lenders and each of their respective assigns. The Liens created by this Note, and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Cases or any other bankruptcy case of any Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Cases or the release of any DIP Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Lender file financing statements or otherwise perfect its security interests or Liens under applicable law.

(m)     THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS PROMISSORY NOTE AND THE TERMS OF THE INTERIM ORDER OR THE FINAL ORDER (AS APPLICABLE), THE TERMS OF THE INTERIM ORDER OR THE FINAL ORDER (AS APPLICABLE) SHALL CONTROL.

*     *     *     *     *

IN WITNESS WHEREOF, the Borrowers have caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

XANADOO HOLDINGS, INC.

By: _____
     Name:
     Title:

XANADOO, LLC

By: _____
     Name:
     Title:

PEGASUS GUARD BAND, LLC

By: _____
     Name:
     Title:

PEGASUS RURAL BROADBAND, LLC

By: _____
     Name:
     Title:

XANADOO SPECTRUM, LLC

By: _____
    Name:
    Title:

LENDER:

XANADOO COMPANY

By: _____
    Name:
    Title:

Commitment Amount: $1,600,00.00

# Exhibit A

**Xanadoo Spectrum, LLC**
**Thirteen Week DIP Budget**

| | Week Ended 6/17/2011 | Week Ended 6/24/2011 | Week Ended 7/1/2011 | Week Ended 7/8/2011 | Week Ended 7/15/2011 | Week Ended 7/22/2011 | Week Ended 7/29/2011 | Week Ended 8/5/2011 | Week Ended 8/12/2011 | Week Ended 8/19/2011 | Week Ended 8/26/2011 | Week Ended 9/2/2011 | Week Ended 9/9/2011 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gross Receipts** | | | | | | | | | | | | | | |
| Customer Receipts | 88,236 | 87,863 | 87,564 | 87,164 | 86,827 | 86,483 | 86,162 | 85,833 | 85,533 | 85,398 | 85,067 | 84,747 | 84,480 | 1,121,129 |
| Sale of Equipment to Resellers | 490 | 490 | 490 | 490 | 490 | 460 | 490 | 490 | 530 | 580 | 580 | 580 | 580 | 6,280 |
| Gross Receipts | 88,239 | 88,353 | 87,654 | 87,317 | 86,983 | 86,652 | 86,323 | 85,649 | 85,597 | 85,927 | 85,327 | 85,699 | 85,069 | 1,127,409 |
| Operating Distributions | 14,628 | 88,207 | 207,449 | (12,256) | 66,605 | (8,786) | 214,279 | 111,942 | 62,568 | 95,259 | 45,173 | 301,758 | 30,500 | 1,348,328 |
| Operating Cash Flow | 73,610 | 147 | (119,456) | (17,256) | 66,605 | (8,786) | (127,626) | (25,619) | 62,568 | (9,470) | 40,414 | (214,431) | 54,569 | (218,919) |
| **Restructuring Disbursements** | 137,750 | 92,083 | 92,083 | 87,000 | 2,555 | 66,250 | 66,250 | 66,250 | 66,250 | 66,250 | 66,250 | 66,250 | 66,250 | 1,010,250 |
| Net Cash Flow | (64,140) | (91,937) | (211,539) | (104,333) | 2,555 | (74,499) | (193,876) | (91,869) | (13,682) | (75,660) | (25,836) | (282,681) | (11,681) | (1,229,186) |
| **Cash Rollforward** | | | | | | | | | | | | | | |
| Beginning Cash | 29,250 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 29,250 |
| Net Cash Flow | (64,140) | (91,937) | (211,539) | (104,333) | 2,555 | (74,499) | (193,876) | (91,869) | (13,682) | (75,660) | (25,836) | (282,681) | (11,681) | (1,229,186) |
| Increase / (Decrease) in Float | (34,890) | (16,937) | (136,539) | (29,333) | 2,555 | (118,876) | (14,869) | (16,869) | (511) | (660) | 49,154 | (207,981) | 63,319 | (1,199,919) |
| DIP Financing | 109,890 | 93,081 | 213,853 | 108,573 | 72,917 | 79,991 | 200,213 | 100,290 | 13,148 | 77,318 | 36,327 | 293,550 | 25,608 | 1,362,604 |
| Ending Cash Before Interest | 75,000 | 76,145 | 77,114 | 79,240 | 80,472 | 80,502 | 81,335 | 83,421 | 84,466 | 85,863 | 85,481 | 85,869 | 85,608 | 162,680 |
| DIP Interest | | 1,145 | 2,114 | 4,340 | 5,472 | 5,502 | 6,335 | 8,421 | 9,466 | 9,603 | 10,481 | 10,869 | 13,527 | 87,685 |
| Ending Cash After Interest | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |
| **Cumulative DIP Financing** | 109,890 | 202,971 | 416,824 | 525,397 | 528,214 | 608,205 | 808,418 | 908,708 | 921,856 | 1,007,119 | 1,043,446 | 1,336,996 | 1,362,604 | 1,362,604 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Compensation, Taxes and Benefits | 72,974 | 72,974 | 8,750 | 72,974 | 72,974 | 72,974 | 81,724 | 81,724 | 72,974 | 72,974 | 81,724 | 81,724 | 81,724 | 464,095 |
| Bandwidth | | | 42,240 | | | 42,240 | | | | | 42,240 | 42,240 | | 126,720 |
| Tower Rental & Related Costs | | | 74,108 | | | 74,108 | | | | | 74,108 | 74,108 | | 222,324 |
| Property & Office Costs (1) | 665 | 665 | 29,995 | 665 | 665 | 665 | 665 | 665 | 665 | 665 | 29,995 | 665 | 665 | 96,545 |
| Equipment Maintenance & Replacement | 2,250 | 2,250 | 4,938 | 2,250 | 2,250 | 2,250 | 17,250 | 4,938 | 7,250 | 7,250 | 4,938 | 4,938 | 2,250 | 67,314 |
| Vehicle Maintenance & Gas | 1,400 | 1,400 | 1,900 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,900 | 1,900 | 1,400 | 19,700 |
| 2.5 GHz License Lease Cost (1) | | | 20,111 | | | | | | | | 20,111 | 20,111 | 19,500 | 80,333 |
| Professional Service Fees | 4,000 | 4,000 | 10,650 | 8,000 | 7,500 | 9,150 | 4,250 | 4,250 | 7,500 | 11,250 | 18,150 | 34,875 | 19,500 | 145,075 |
| Insurance | 3,043 | 3,043 | 3,035 | 3,023 | 3,012 | 2,988 | 2,968 | 2,917 | 2,968 | 2,961 | 2,954 | 2,943 | 2,934 | 38,883 |
| Sales Support & Commissions | 1,770 | 2,370 | 1,890 | 1,390 | 1,390 | 1,890 | 1,390 | 1,430 | 1,480 | 1,480 | 1,980 | 1,980 | 1,480 | 21,330 |
| Personal Property Tax and Other | 1,500 | 1,500 | 6,200 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 6,200 | 6,200 | 1,500 | 33,600 |
| Modem Purchases and Activations | 3,663 | 3,731 | 3,731 | 3,731 | 20,789 | 20,789 | 778 | 778 | 774 | 774 | 771 | 39,500 | 21,478 | 64,775 |
| Operating Disbursements | 14,628 | 88,207 | 207,449 | 99,904 | 18,512 | 95,222 | 214,279 | 111,942 | 23,495 | 95,259 | 45,173 | 301,758 | 30,500 | 1,348,328 |
| **Restructuring Disbursements** | | | | | | | | | | | | | | |
| US Trustee Fees | 47,500 | 47,500 | 47,500 | 47,500 | | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 4,875 | 4,875 |
| Bankruptcy Counsel | 5,000 | 5,000 | 5,000 | 5,000 | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 25,000 | 415,000 |
| Claims & Noticing Agent | | | | | | | | | | | | | 5,000 | 60,000 |
| DIP Counsel | 6,250 | 6,250 | 6,250 | 6,250 | | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 81,250 |
| Debtor Financial Advisors & Investment Bankers (2) | 20,000 | 20,000 | 20,000 | 20,000 | | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 260,000 |
| Committee Professionals | | 13,333 | 13,333 | 13,333 | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 20,000 | 130,000 |
| Total Bankruptcy Administration Fees | 73,750 | 92,083 | 92,083 | 92,083 | | 66,250 | 66,250 | 66,250 | 66,250 | 66,250 | 66,250 | 66,250 | 71,125 | 951,125 |
| DIP Commitment Fees | 64,000 | | | | | | | | | | | | | 64,000 |
| **Total Restructuring Disbursements** | 137,750 | 92,083 | 92,083 | | | 66,250 | 66,250 | 66,250 | 66,250 | 66,250 | 66,250 | 66,250 | 71,125 | 1,015,125 |

(1) Estimated amounts are based on contractual amounts. The Company expects to reduce these amounts by more than 50% by renegotiating reduced payment obligations.
(2) Debtor preliminary estimate. Actual expenses incurred may be significantly less. Investment banking services may be procured on a success basis with fees only being earned upon realization of funds.