# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

In re:

PEGASUS RURAL BROADBAND, LLC, *et al.*,[1]

Debtors.

-------------------------------------------------------------x

Chapter 11

Case No. 11-11772 (PJW)

Jointly Administered

**Objection Deadline: September 16, 2011 at 4:00 p.m. (prevailing Eastern time)**
**Hearing Date: September 27, 2011 at 9:30 a.m. (prevailing Eastern time)**

## [REDACTED] MOTION OF BPC AS LLC FOR ORDER, PURSUANT TO 11 U.S.C. § 1112(b), TO DISMISS CHAPTER 11 CASE OF XANADOO SPECTRUM, LLC AND FOR ORDER, PURSUANT TO 11 U.S.C. § 1104(a), APPOINTING CHAPTER 11 TRUSTEE FOR XANADOO HOLDINGS, INC.; PEGASUS RURAL BROADBAND, LLC; PEGASUS GUARD BAND, LLC; AND XANADOO LLC

---

[1] The Debtors are Xanadoo Spectrum, LLC, a Delaware limited liability company; Xanadoo Holdings, Inc, a Delaware corporation; Xanadoo, LLC, a Delaware limited liability company; Pegasus Guard Band, LLC, a Delaware limited liability company; and Pegasus Rural Broadband, LLC, a Delaware limited liability company. Xanadoo Holdings, Inc. is the sole member of Xanadoo, LLC, Pegasus Guard Band, LLC, and Pegasus Rural Broadband, LLC. Xanadoo Holdings, Inc. is a wholly owned subsidiary of Xanadoo Spectrum, LLC.

# TABLE OF CONTENTS

<u>Page</u>

**I.**   Preliminary Statement ........................................................................... 1

**II.**  The Debtors Have Not Restructured Their Business Over the Three-Year Period Since The Obligations First Went Into Default and Twice Entered Into Prohibited Transfers of Assets in Order to Benefit the Parent and No One Else ........................................................................... 4

    **A.**  The Underlying Agreements Impose a Number of Obligations on the Debtors and the Parent ........................................................... 4

    **B.**  The Parent and the Debtors Have Been in Default On the Obligations For Over Three Years ................................................ 7

    **C.**  The Parent First Attempted an Unauthorized Transfer of the XHI Stock Six Months Prior to the Commencement of the Bankruptcy Cases ........................................................................... 9

    **D.**  The Commencement of These Chapter 11 Cases Immediately Followed the Parent's Second Unauthorized Transfer of the XHI Stock to a Newly Created, Wholly Owned Subsidiary That Had No Other Assets or Creditors and Had Been Formed Solely to File For Bankruptcy ........................................................................... 11

    **E.**  Despite Having Had Over Three Years to Resolve Their Defaults and Satisfy the Obligations, the Debtors Have Been Unable or Unwilling To Do So ...................................................................... 14

**III.** Jurisdiction .......................................................................................... 16

**IV.**  Relief Requested .................................................................................. 17

**V.**   Argument ............................................................................................. 17

    **A.**  Spectrum's Chapter 11 Petition Was Filed in Bad Faith and Should Be Dismissed ................................................................... 17

        **1.**  Legal Standard Governing Dismissal of Bankruptcy Case Filed in Bad Faith ........................................................ 17

        **2.**  Spectrum's Chapter 11 Case Should Be Dismissed Because the Uncontrovertable Facts Demonstrate That It Was Filed in Bad Faith ................................................................. 19

B.     Appointment of a Chapter 11 Trustee Is Appropriate in the Cases of XHI, PRB, PGB and XLC (and, If Extant, Spectrum) ........................ 21

    1.     Legal Standards Governing Appointment of Chapter 11 Trustee ................................................................................................... 21

    2.     "Cause" Exists For Appointment of Chapter 11 Trustee and Such Appointment Is in the Interests of Estate and Other Parties in Interest ............................................................................. 25

C.     Conclusion ................................................................................................ 28

VI.     No Prior Request ................................................................................................ 29

VII.     Notice ................................................................................................................ 29

BPC AS LLC (the "Agent"), collateral agent for the holders (the "Noteholders," and together with the Agent, the "Noteholder Parties") of 12.5% Senior Secured Promissory Notes (the "Notes") and puttable Warrants (the "Warrants," and together with the Notes, guaranties and other obligations under the related transaction documents, the "Obligations") issued by certain of the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned cases, hereby files this motion (the "Motion") for an order, substantially in the form attached hereto as **Exhibit A**: (i) dismissing the chapter 11 case of Xanadoo Spectrum, LLC ("Spectrum"), pursuant to section 1112(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"); and (ii) appointing a chapter 11 trustee in the chapter 11 cases of Xanadoo Holdings, Inc. ("XHI"); Pegasus Rural Broadband, LLC ("PRB"); Pegasus Guard Band, LLC ("PGB"); and Xanadoo LLC ("XLC," and together with PRB and PGB, the "Operating Subsidiaries"), and, if extant, Spectrum, pursuant to section 1104(a) of the Bankruptcy Code.

## I.     Preliminary Statement

1.    The Court should dismiss Spectrum's chapter 11 case because it was filed in bad faith in an effort to hinder, delay and defraud creditors. Spectrum is a shell company, with no operations or employees. It was formed on the eve of the Debtors' bankruptcy filings for the sole purpose of taking possession of the capital stock of XHI (the "XHI Stock") from Xanadoo Company (the "Parent"), the ultimate parent company of the Debtors. It then filed for bankruptcy protection in an effort to prevent the Noteholder Parties' foreclosure upon the XHI Stock. The transfer of the stock was in breach of the contractual obligations of the Parent, XHI and the Operating Subsidiaries to

the Noteholder Parties that specifically precluded such transfer absent the Noteholders' approval, which the Parent neither sought nor obtained.

2.    Spectrum's chapter 11 case is nothing more than an attempt to shield the Parent from its obligations to the Noteholder Parties while preserving the Parent's control of a single non-operating asset, the XHI Stock. Spectrum was formed solely to be a bankrupt company. It has no business purpose other than to hold the XHI Stock, no creditors other than the Noteholder Parties, and nothing to reorganize. It is, from the beginning, a hastily arranged conduit whereby the Parent is attempting to get the benefits of the automatic stay to protect its interest in the XHI Stock without incurring any of the burdens imposed on chapter 11 debtors. Had the Parent truly wished to resolve its operational and financial difficulties through the protections and processes offered by the Bankruptcy Code, it should have filed its own bankruptcy petition along with the petitions of XHI and the Operating Subsidiaries. The Parent's attempt to unilaterally craft chapter 11 protections for itself using Spectrum as a conduit is the essence of a bad faith filing. Accordingly, Spectrum's chapter 11 case should be dismissed.

3.    Separately, the Court also should appoint a chapter 11 trustee to administer the chapter 11 estates of XHI and the Operating Subsidiaries (and, if extant, Spectrum) "for cause" and for the benefit of all parties in interest. The current management of these Debtors has produced no viable plan (or accumulated a dollar of positive cash flow) since the secured debt first went into default in March 2008. Continuing management over these estates does nothing more than generate further delays and losses to the detriment of the estates and their creditors, who are basically

limited to the secured Noteholder Parties. Management has demonstrated that it is either incapable or unwilling to find a meaningful solution to this two-party dispute, despite having had over three years to do so. In either event, current management should not remain in control of the Debtors' assets. Furthermore, the same management team orchestrated the bad faith filing noted above solely for the benefit of the Parent at the expense of creditors, displaying an overt disregard for their contractual obligations.

4.     An unconflicted chapter 11 trustee should be installed to ensure that <u>all</u> reasonable solutions to maximize the value of the estates are explored on a reasonable timeframe, not just those options that would redound to the benefit of the managers and the non-debtor Parent.

5.     In short, these chapter 11 cases have been filed solely as a means to delay resolution of a two-party dispute involving the Parent and managers of the Debtors, on the one hand, and secured creditors owed nearly $60 million, on the other. The secured Obligations underlying this dispute have been in default since March 2008. Over the ensuing three years, under the Parent's and managers' oversight, the Debtors have (i) <u>admittedly</u> violated debt covenants at least 75 times; (ii) accumulated ███ █████████████████████ operating losses; (iii) failed to make any interest or principal payments on the Obligations; and (iv) failed to develop any meaningful solution (operationally, financially, strategically or otherwise) that assures that the Obligations will be paid in full now or ever. More recently, and as noted above, on the eve of bankruptcy, the Parent and the managers secretly shifted collateral securing the Obligations to a newly formed shell entity, Spectrum, as part of an overall strategy

designed to hinder, delay and defraud the secured creditors, shield the Parent from its obligations and perpetuate the managers' control over the Debtors.

**II.    The Debtors Have Not Restructured Their Business Over the Three-Year Period Since The Obligations First Went Into Default and Twice Entered Into Prohibited Transfers of Assets in Order to Benefit the Parent and No One Else**

**A.    The Underlying Agreements Impose a Number of Obligations on the Debtors and the Parent**

6.    In 2007, Post Advisory Group, LLC ("Post"), as collateral agent at that time, entered into a Securities Purchase Agreement, dated May 17, 2007 (together with amendments thereto, the "Purchase Agreement"), with XHI, the Operating Subsidiaries, the Noteholders and the Parent, pursuant to which the Noteholders purchased the Notes in the aggregate principal amount of $30,000,000.[2] The Notes were issued by XHI and guaranteed by the Operating Subsidiaries and the Parent, pursuant to full recourse guaranties and a limited recourse guaranty, respectively. The Agent has since replaced Post as collateral agent. (See *Declaration of Gary Hobart in Support of the Motion of BPC AS LLC For Order, Pursuant to 11 U.S.C. § 1112(b), to Dismiss Chapter 11 Case of Xanadoo Spectrum, LLC and For Order, Pursuant to 11 U.S.C. § 1104(a), Appointing Chapter 11 Trustee For Xanadoo Holdings, Inc.; Pegasus Rural Broadband, LLC; Pegasus Guard Band, LLC; and Xanadoo LLC* ("Hobart Decl.")[3] ¶ 3, attached hereto as **Exhibit B**.)

7.    The proceeds of the Notes issued pursuant to the Purchase Agreement were intended to be used primarily for the roll-out of XHI's business, defined

---

[2]    In addition to the Purchase Agreement, the relevant parties also entered into, among other things, the Non-Recourse Parent Guaranty, the Subsidiary Guaranty, the Parent Pledge Agreement and the Security Agreement (collectively, with the Purchase Agreement, the Notes and the Warrants, the "Transaction Documents").

[3]    Each exhibits to the Hobart Declaration is referred to herein as a "Hobart Exhibit."

in the Purchase Agreement as "the owning, leasing, management and acquisition of the licensed spectrum in the 2.5 GHz frequency, the owning, leasing and management for investment of the licensed spectrum in the 700 MHz frequency, and the provision of broadband services using licensed 2.5 GHz frequency or unlicensed spectrum and businesses related thereto." (See Hobart Decl. ¶ 6; Purchase Agreement §§ 5.24, 8.24 and 1.1 (definition of "Business") (see Hobart Exhibit 1).)

8.    The Notes were to bear interest at 12.5% *per annum paid* semi-annually, and 14.5% *per annum* paid monthly upon an event of default. The Notes had a scheduled maturity date of May 17, 2011. (See Hobart Decl. ¶ 7; Purchase Agreement § 2.7 (see Hobart Exhibit 1); Notes §1(a) and face (see Hobart Exhibit 2).)

9.    Additionally, in accordance with the Purchase Agreement, XHI issued the Warrants to the original Noteholders which entitle the holders thereof to acquire 17% of the total capital stock of XHI at an aggregate exercise price of $19.7 million. The Warrants are puttable to XHI by their holders, in certain circumstances, for an aggregate payment of at least $7 million (the "Warrant Put Right"). (See Hobart Decl. ¶ 8; Purchase Agreement § 2.2 (see Hobart Exhibit 1); Warrants § 6 (see Hobart Exhibit 3).)

10.    The Obligations, including the Notes and the Warrant Put Right, are secured on a *pari passu* basis by a first priority perfected lien on the XHI Stock[4] and the equity interests in the Operating Subsidiaries, and substantially all of the assets of XHI and the Operating Subsidiaries, excluding certain Federal Communications Commission ("FCC") licenses over which the Noteholder Parties enjoy a contractual

---

[4]    At the time of the Purchase Agreement, the XHI Stock was held directly by the Parent.

negative pledge.  (See Hobart Decl. ¶ 9; Purchase Agreement §§ 5.12(b), 8.7 (see Hobart

Exhibit 1); Parent Pledge Agreement § 1 (definition of "Collateral") (see Hobart Exhibit

4); Security Agreement §§ 1 (definition of "Collateral"), 2(a) (see Hobart Exhibit 5);

Warrants § 6.3 (see Hobart Exhibit 3).)

        11.     Pursuant to the Purchase Agreement, XHI is subject to certain

financial and operational covenants generally measured on a quarterly and annual basis.

In connection therewith, the principal financial officer of XHI is required to deliver to the

Agent periodic compliance certificates certifying as to XHI's and the Operating

Subsidiaries' compliance with the Purchase Agreement and the other transaction

documents.  (See Hobart Decl. ¶ 10; Purchase Agreement § 8.5(a) (see Hobart Exhibit

1).)

        12.     The Transaction Documents governing the Notes specifically

require the Parent to retain possession of, and at all times pledge, the XHI Stock as

collateral for repayment of the Obligations.  The Purchase Agreement and other

Transaction Documents prohibit the Parent's transfer of the XHI Stock unless the

Noteholder Parties agree to the form and substance of such transfer and such transfer is

made to a wholly-owned subsidiary of the Parent, which, in turn, agrees to fully guaranty

the Obligations and pledge the XHI Stock in support thereof.  (See Hobart Decl. ¶ 11;

Purchase Agreement § 8.39 (see Hobart Exhibit 1); Parent Pledge Agreement § 4(b) (see

Hobart Exhibit 4); Warrants § 5.2 (see Hobart Exhibit 3).)

        13.     At all times, the principal officers of the Parent, including the

controlling shareholder and Chief Executive Officer, Marshall Pagon, were also the

principal officers or principal decision makers of XHI and the Operating Subsidiaries.

Mr. Pagon is the Chairman of the Board, Chief Executive Officer, President and controlling stockholder of Parent. Mr. Pagon beneficially holds a majority of the voting power of Parent's common stock, including in respect of the election of Parent's directors.

14. Since issuance, the Notes and other Obligations owed to the Noteholder Parties have essentially remained the only funded debt obligations of XHI and the Operating Subsidiaries. (See Hobart Decl. ¶ 13.)

### B. The Parent and the Debtors Have Been in Default On the Obligations For Over Three Years

15. *Less than one year after the issuance of the Notes*, beginning with the quarter ending March 31, 2008 and at least quarterly thereafter, XHI began reporting its failure to comply with numerous requirements and covenants under the Purchase Agreement and the other Transaction Documents. Such failures constituted Defaults and Events of Default under the Purchase Agreement. On May 20, 2008, the collateral agent sent a default and reservation of rights notice to XHI. (See Hobart Decl. ¶ 14 & Hobart Exhibit 6 – *May 20, 2008 Default and Reservation of Rights Notice.*)

16. After the first default was reported, representatives of the Parent, XHI and the Operating Subsidiaries and the collateral agent entered into confidential settlement discussions in an attempt to resolve the defaults. These discussions included potential solutions involving a resetting of the covenants, extension of the maturity date of the Notes, a potential new cash infusion by the Noteholders, a refinancing of the Notes and a potential global restructuring of the Parent's and its subsidiaries capital structures. (See Hobart Decl. ¶ 15.)

17.     During these discussions, in order to shore up dwindling liquidity and notwithstanding the defaults, the Noteholders agreed to purchase and did purchase from XHI $1.1 million of additional Notes for cash on November 25, 2008. (See Hobart Exhibit 7 – *Amendment No. 1 to the Purchase Agreement, entered into November 25, 2008.*) However, despite numerous confidential settlement discussions since then, during which time the defaults and losses continued, the Parent and the Debtors have not been able to satisfy the Obligations. (See Hobart Decl. ¶ 16.)

18.     The most recent compliance certificate issued by XHI prepetition, which relates to the financial statements as of April 30, 2011 (and which is dated June 8, 2011 and was received by the Agent on June 9, 2011) concedes *75 separate Defaults and Events of Default* (as those terms are defined in the Purchase Agreement) occurring since March 2008, none of which have been cured.[5]  Such Events of Default include the failure to pay interest and principal when due.  Indeed, no interest or principal has ever been paid since the March 2008 default. (See Hobart Decl. ¶ 17 & Hobart Exhibit 8 – *June 8, 2011 Compliance Certificate.*)

19.     Since March 31, 2008 through the last reported financial statements on April 30, 2011, the Debtors have accumulated ███████ operating losses. (See Hobart Decl. ¶ 18 & Hobart Exhibit 9 – *April 30, 2011 Financial Statements.*)

20.     Throughout the past three years, although under no obligation to do so, the collateral agent repeatedly discussed solutions to the defaults and debt repayment obligations through a series of two-party discussions both with and without

---

[5]     The Debtors' acknowledged list of 75 Defaults and Events of Default does not include Defaults resulting from the First Unauthorized Transfer (defined below), the second unauthorized transfer of the XHI Stock (described below), and the failure to pay off the Notes at maturity.

counsel. However, the Parent, the Debtors and their principal officers failed to produce any acceptable solution and rejected all proposals by the collateral agent. (See Hobart Decl. ¶ 19.)

**C.      The Parent First Attempted an Unauthorized Transfer of the XHI Stock Six Months Prior to the Commencement of the Bankruptcy Cases**

21.     In December 2010, the Parent, XHI and the Operating Subsidiaries proposed interposing a new foreign entity into their corporate structure, allegedly to preserve certain existing tax attributes *for the Parent's benefit* that were to expire at year-end 2010. Specifically, the Parent proposed to transfer its ownership of the XHI Stock to a newly-formed Cayman Islands company and proposed substitutes to the relevant Transaction Documents regarding the Parent's limited guaranty and pledge of the XHI Stock to secure the Obligations. (See Hobart Decl. ¶ 20.)

22.     The Purchase Agreement, the Non-Recourse Parent Guaranty and the Parent Pledge Agreement require the XHI Stock to be held by the Parent, although such agreements permit the Parent to transfer the XHI Stock to a wholly-owned subsidiary only on the conditions that both (a) such subsidiary has entered into a replacement guaranty and pledge agreement and (b) such documents shall be in form and substance reasonably acceptable to the Noteholder Parties. In addition, the Warrants require additional agreements by the transferee. (See Hobart Decl. ¶ 21; Purchase Agreement § 8.39 (see Hobart Exhibit 1); Non-Recourse Parent Guaranty § 1 (definition of "Guarantied Obligations") (see Hobart Exhibit 10); Parent Pledge Agreement §§ 1(b) (definition of "Guaranteed Obligations"), 4(b) (see Hobart Exhibit 4); Warrants § 5.2 (see Hobart Exhibit 3).)

23. The collateral agent, by and through its counsel, repeatedly raised legitimate and timely questions and concerns regarding the December 2010 proposal, including a request to confirm with Cayman Islands counsel that the Noteholders' rights would be protected notwithstanding the unilateral introduction of a foreign obligor. Despite repeated requests by the collateral agent, by and through its counsel, XHI never scheduled a call with XHI's Cayman Islands counsel. (See Hobart Decl. ¶ 22.)

24. Moreover, the Noteholders never approved the form or substance of the documents for the proposed transfer, as the Purchase Agreement requires. (See Hobart Decl. ¶ 23.)

25. Nevertheless, on January 4, 2011, the Parent informed the collateral agent's counsel that, notwithstanding counsel's stated concerns, the Parent completed the unauthorized transfer of the XHI Stock to a newly formed Cayman Islands company (the "First Unauthorized Transfer"), without having received requisite approval of the Noteholders and, thus, in violation of the Purchase Agreement. (See Hobart Decl. ¶ 24.)

26. In response, on January 26, 2011, the Agent, by and through its counsel, informed XHI that it believed that the First Unauthorized Transfer violated the terms of the Purchase Agreement and demanded that the First Unauthorized Transfer be unwound or reversed. (See Hobart Decl. ¶ 25.)

27. The Parent thereafter informed the collateral agent's counsel that, having allegedly secured the tax benefits it sought, it had dissolved the Cayman Islands company and the XHI Stock was restored to the Parent on March 14, 2011. (See Hobart Decl. ¶ 26.)

28.     Despite the continual delay of XHI and the Parent and the Parent's dubious actions in effectuating the First Unauthorized Transfer, the collateral agent continued to attempt to negotiate a consensual restructuring of the Obligations, including up to and after the Notes matured on May 17, 2011.  (See Hobart Decl. ¶ 27.)

**D.     The Commencement of These Chapter 11 Cases Immediately Followed the Parent's Second Unauthorized Transfer of the XHI Stock to a Newly Created, Wholly Owned Subsidiary That Had No Other Assets or Creditors and Had Been Formed Solely to File For Bankruptcy**

29.     The Notes matured on May 17, 2011.  (See Hobart Decl. ¶ 28.)

30.     On May 20, 2011, the Agent delivered to the Parent, XHI and the Operating Subsidiaries:  (i) a Notice of Maturity, which, among other things, demanded immediate payment in full of all obligations under the Purchase Agreement and the Notes; and (ii) a letter offering to enter into confidential settlement discussions with respect to the obligations under the Purchase Agreement and the Notes.  (See Hobart Decl. ¶ 29; Hobart Exhibit 11 – *May 20, 2011 Notice of Maturity*; Hobart Exhibit 12 – *May 20, 2011 Settlement Discussions Offer Letter*.)

31.     The Parent, XHI and the Operating Subsidiaries signed a confidential letter agreement and two-party settlement discussions continued. Unfortunately, these settlement discussions were not fruitful.  (See Hobart Decl. ¶ 30.)

32.     To ensure that the Parent preserved the Noteholder Parties' collateral, the Agent, on June 9, 2011, delivered to the Parent a notice pursuant to which the Agent demanded that the Parent, among other things, take all actions to (in accordance with the Parent's existing contractual obligations under the Transaction Documents) preserve at the Parent the pledged XHI Stock, refrain from disposing of the XHI Stock, and take all actions necessary to transfer the XHI Stock to the Agent

11

(including applying to the FCC for authorization for such transfer).  (See Hobart Decl. ¶ 31 & Hobart Exhibit 13 – *June 9, 2011 Notice to Parent*.)

33. Nonetheless, in willful violation of its obligations under the Purchase Agreement, the Non-Recourse Parent Guaranty, the Parent Pledge Agreement and the Warrants,[6] and for no purpose other than to shield the XHI stock from foreclosure as well as shield the Parent from its obligations, the Parent did not preserve the XHI Stock.  (See Hobart Decl. ¶ 32.)

34. Instead, the Parent unilaterally transferred ownership in the XHI Stock to a newly-formed wholly owned subsidiary, Spectrum, an entity that does not have any operations, employees, capital structure or any other creditors and apparently was organized with the primary (if not the sole) intention that it file for bankruptcy protection once in possession of the XHI Stock.  Delaware corporate filings indicate that Spectrum was formed on June 3, 2011.  (See Hobart Decl. ¶ 33 & Hobart Exhibit 14 – *Xanadoo Spectrum, LLC Certificate of Formation*.)

35. Contrary to the express obligations imposed on the Parent, XHI and the Operating Subsidiaries, Spectrum did not enter into any replacement guaranty or pledge agreement with the Noteholder Parties to reassure them of their rights in the XHI Stock as collateral for the Obligations, nor did Spectrum assume the Parent's obligations under the Warrants.  Indeed, no request was even made for this second unauthorized transfer and none of the required documents were ever presented.  (See Hobart Decl. ¶ 34; Purchase Agreement §8.39 (see Hobart Exhibit 1); Non-Recourse Parent Guaranty §

---

[6] The transfers of the XHI Stock in the First Unauthorized Transfer and on the eve of bankruptcy also violate the terms of the Warrants, which require that the Parent secure the commitment of any such transferee to succeed to the Parent's obligations under the Warrants (e.g., with respect to certain tag along rights). (See Warrants § 5.2.)

1 (definition of "Guaranteed Obligations") (see Hobart Exhibit 10); Parent Pledge

Agreement § 4(b) (see Hobart Exhibit 4); Warrants § 5.2 (see Hobart Exhibit 3).)

36.     On June 10, 2011, ignoring its contractual obligations, the Parent

and managers caused Spectrum, XHI and the Operating Subsidiaries to file for chapter 11

protection in this Court.  (See Hobart Decl. ¶ 35.)

37.     The Parent's actions with respect to Spectrum apparently were

designed solely to prevent the Noteholder Parties from exercising their legal rights and

remedies with respect to the Notes, thus preserving the Parent's alleged equity in a failing

enterprise.[7]

38.     In addition, the illicit transfer of the XHI Stock avoided the need

for the Parent to file for bankruptcy protection itself in order to stave off foreclosure.

Effectively, the Parent used Spectrum as a conduit to gain access to the automatic stay to

shield the XHI Stock.[8]

---

[7]     Although Parent believes that its equity has value, the Debtors' monthly operating report indicates that no valuation has been prepared for more than one year.  See *Debtors' Monthly Operating Report For The Period June 10, 2011 To June 30, 2011 – Global Notes* ¶ 4 [Docket No. 149] (see Hobart Exhibit 7).

[8]     Through their unauthorized prepetition actions, the current management singlehandedly altered how risk was allocated with respect to the Obligations for the benefit of the Parent.  Initially, the deal was structured such that, in the event that XHI and the Operating Subsidiaries failed to generate the revenue required to service the Obligations, the Noteholder Parties had the available remedy to foreclose upon the XHI Stock, take control of the enterprise and determine for themselves what the best solution would be.  Alternatively, the Noteholder Parties took the risk that the Parent would wish to buy more time to restructure the Obligations by filing itself for bankruptcy but, in that event, the Parent's assets would effectively be available to administer the Parent's estate and potentially cover its obligations to the Noteholders.  In that case, the Parent's operations and financials would be subject to the transparency and other restrictions imposed on debtors in chapter 11 who wish to get the benefits of the automatic stay.  The Noteholder Parties specifically contracted with the Parent so that the Noteholder Parties did not take the risk that the Parent would, without the Noteholder Parties' required authorization, transfer their collateral to a new affiliate that was not itself an obligor, guarantor or pledgor with respect to the Obligations or capable of substantively performing thereon.  These contractual protections, among other things, were meant to ensure that the Parent did not create a bankruptcy conduit (like Spectrum) in order to file its enterprise for bankruptcy and keep itself out of the process.  Indeed, such action was specifically prohibited.

**E.    Despite Having Had Over Three Years to Resolve Their Defaults and Satisfy the Obligations, the Debtors Have Been Unable or Unwilling To Do So**

39.    Over the three years since the Obligations first went into default, under the Parent's and managers' oversight, the Debtors have (i) admitted to 75 defaults and events of default; (ii) accumulated ███████████████ operating losses; (iii) failed to make any interest or principal payments on the secured debt; and (iv) failed to come up with any meaningful solution (operationally, financially, strategically or otherwise) that assures that this secured debt will be paid in full now or ever.  (See Hobart Decl. ¶ 36.)

40.    The Debtors' own projections indicate that operating losses will continue to accumulate even before factoring in chapter 11 administrative costs. Specifically, the cash flow projections set forth in Debtors' DIP budget and Initial Monthly Operating Report indicate that the Debtors expect to continue to consume cash – that more than $2 million will be borrowed but not repaid over the next several months. (See Hobart Decl. ¶ 37; *Debtors' Motion For Entry of Second Interim Order Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364 and 507 of the Bankruptcy Code and Fed. R. Bankr. P. 2002, 4001 and 9014 (i) Authorizing Debtors to Obtain Post-Petition Financing Pursuant to Section 364 of the Bankruptcy Code, (ii) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (iii) Granting Liens and Super-Priority Claims, (iv) Granting Adequate Protection to the Prepetition Secured Parties, and (v) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c) Local Rule 4001-2(c), Ex. B* (the "DIP Budget") [Docket No. 161] (see Hobart Exhibit 15); see also *Debtors' Initial Monthly Operating Report, Ex. 1* [Docket No. 75] (see Hobart Exhibit 16).)

41.     Substantially all of the employees of the consolidated enterprise are employed and paid by the Debtors, although one or two senior executives may be employed by the Parent. Nonetheless, both before and after the Debtors' petition date, the Parent has continued to charge and accrue a sizable fee, approximately $1.25 million per year, or more than 25% of the Debtors' gross revenue, under a subordinated management agreement, even though the accrual of such management fees during the occurrence of an event of default is prohibited under the Purchase Agreement. (See Hobart Decl. ¶ 38; Purchase Agreement § 8.42; *April 30, 2011 Financial Statements* (see Hobart Exhibit 9); *Debtors' Monthly Operating Report For The Period June 10, 2011 To June 30, 2011 – Statement of Operations* [Docket No. 149] (see Hobart Exhibit 17).)

42.     Although they have continuously lost money and project to continue to lose money from operations, the Debtors' indicated in their first-day pleadings that they have two potential exit strategies. (See Hobart Decl. ¶ 39.)

43.     First, they suggest that they "*may* be able to find new funding sources to replace the Notes and allow the Debtors to exit these bankruptcy cases in control of all or substantially all of its [sic] assets." (Verlin Decl.[9] ¶ 38 (emphasis added) (see Hobart Exhibit 18).) This stand-alone strategy hinges on the Debtors' belief that "the value of the Debtors' licenses, particularly the 700 MHz licenses, are well in excess of the Debtors' liabilities." Id. (see Hobart Exhibit 18). However, this newly-suggested strategy is in direct contravention to the Debtors' actions over the last three years, in which they either did not try to obtain replacement financing or did not succeed in doing so. (See Hobart Decl. ¶ 40.)

---

[9]     *Declaration of Howard Verlin In Support of Chapter 11 Petitions and First Day Orders and Related Relief*, dated June 12, 2011 [Docket No. 14] (see Hobart Exhibit 18).

44.     Second, the Debtors suggest that "[a]lternatively, the Debtors may be able to sell the 700 MHz licenses for an amount substantially in excess of all amounts owed to [the Noteholders]." Verlin Decl. ¶ 39.  The Debtors believe that "the current fair market value for these licenses is in excess of $200 million," which "value may be greatly increased *depending on* change to the evolving regulatory market with respect to [the] spectrum." Id. (emphasis added).  Again, this asset sale strategy is contrary to the Debtors' actions over the last three years, in which they either did not actually try to pursue asset sales or did not succeed in doing so.  It is also inconsistent with the Debtors' recent operating report which discloses that the Debtors have not undertaken any valuation within the last year.[10]  (See Hobart Decl. ¶ 41; *Debtors' Monthly Operating Report For The Period June 10, 2011 To June 30, 2011 – Global Notes* ¶ 4 [Docket No. 149] (see Hobart Exhibit 17).)

45.     As of the Debtors' petition date, the Obligations owed to the Noteholder Parties were approximately $60 million.  (See Hobart Decl. ¶ 42.)

### III.     Jurisdiction

46.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[10] XHI has failed to provide an updated valuation report for fiscal year 2010, in further breach of the Purchase Agreement.  (See Purchase Agreement § 8.25(e).)  Moreover, it would appear that the Debtors' suggested market value for their 700 MHz licenses depends, in part, upon certain legal and regulatory changes.  It has been reported that a plan has been circulating for some time in Congress to create "incentive auctions" for licenses in this particular spectrum currently held by private owners, in order to allow for the creation of national "4G" networks and a nationwide wireless communications network for emergency responders.  Nevertheless, it is far from clear when and if such a plan will finally be formulated and approved by Congress and/or what its impact might be.

## IV.     Relief Requested

47.     By the Motion, the Agent respectfully requests entry of an order:

(i) dismissing the chapter 11 case of Spectrum, pursuant to section 1112(b) of the

Bankruptcy Code; and (ii) appointing a chapter 11 trustee in the chapter 11 cases of XHI,

PRB, PGB and XLC (and, if extant, Spectrum), pursuant to section 1104(a) of the

Bankruptcy Code.

## V.     Argument

### A.     Spectrum's Chapter 11 Petition Was Filed in Bad Faith and Should Be Dismissed

#### 1.     Legal Standard Governing Dismissal of Bankruptcy Case Filed in Bad Faith

48.     "Chapter 11 bankruptcy petitions are subject to dismissal under 11

U.S.C. § 1112(b) unless filed in good faith...." NMSBPCSLDHB, L.P. v. Integrated

Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108, 118 (3d

Cir. 2004); In re SGL Carbon Corp., 200 F.3d 154, 162 (3d Cir. 1999). The debtor bears

the burden of establishing good faith. SGL Carbon, 200 F.3d at 162 n.10.

49.     "Whether the good faith requirement has been satisfied is a fact

intensive inquiry in which the court must examine the totality of the circumstances and

determine where a petition falls along the spectrum ranging from the clearly acceptable to

the patently abusive." Bepco, L.P. v. 15375 Memorial Corp. (In re 15375 Memorial

Corp.), 400 B.R. 420, 427 (D. Del. 2009) (quoting Integrated Telecom, 384 F.3d at 118;

SGL Carbon, 200 F.3d at 162) (internal quotation marks omitted). Courts in this

jurisdiction have set out the relevant evidentiary factors that courts should review prior to

determining whether a case should be dismissed:

(a) Single asset case;

(b) Few unsecured creditors;

(c) No ongoing business or employees;

(d) Petition filed on eve of foreclosure;

(e) Two party dispute which can be resolved in state court action;

(f) No cash or income;

(g) No pressure from non-moving creditors;

(h) Previous bankruptcy petition;

(i) Prepetition conduct was improper;

(j) No possibility of reorganization;

(k) Debtor formed immediately prepetition;

(l) Debtor filed solely to create automatic stay; and

(m) Subjective intent of the debtor.

See Primestone Inv. Partners L.P. v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.), 272 B.R. 554, 557 (D. Del. 2002) (citing SGL Carbon, 200 F.3d at 165; In re Phoenix Piccadilly, Ltd., 849 F.2d 1393, 1394–95 (11th Cir. 1988); In re SB Properties, 185 B.R. 198, 205 (E.D. Pa. 1995)); In re Crown Village Farm, LLC, 415 B.R. 86, 92 (Bankr. D. Del. 2009). This list is not exhaustive, and no one factor should be controlling. Crown Village, 415 B.R. at 92 (citing In re PPI Enters. (U.S.), Inc., 324 F.3d 197, 211 (3d Cir. 2003); In re Shar, 253 B.R. 621, 630 (D.N.J. 1999)).

50.     Once these pieces of factual information are ascertained, courts must next apply them when considering: "(1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving the going concern or maximizing the value of the

18

debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." 15375 Memorial, 400 B.R. at 427 (quoting Integrated Telecom, 384 F.3d at 119–20).

51.     Under the first of these considerations, courts in this Circuit have made clear that even where the debtors are not attempting to preserve a going concern, for example when a liquidation plan will be filed, they can still satisfy the good faith requirement, provided that the filing preserves "some value that otherwise would be lost outside of bankruptcy." 15375 Memorial, 400 B.R. at 427 (quoting Integrated Telecom, 384 F.3d at 120). "Reorganization . . . is not the only appropriate use of Chapter 11 since the Code clearly contemplates liquidating plans under 11 U.S.C. § 1123(b)(4)." Integrated Telecom, 384 F.3d at 120 n.4 (internal quotation marks omitted). Therefore, so long as the liquidation plan is maximizing the value of the debtor's estate, it serves a valid bankruptcy purpose and meets the good faith requirement. See id.

52.     As for the second question, timing is a key element. Generally, a court must evaluate whether the timing of the filing of a chapter 11 petition indicates that the "*primary,* if not *sole,* purpose of the filing was a litigation tactic." 15375 Memorial, 400 B.R. at 427 (quoting SGL Carbon, 200 F.3d at 165) (emphasis added).

## 2.     Spectrum's Chapter 11 Case Should Be Dismissed Because the Uncontrovertable Facts Demonstrate That It Was Filed in Bad Faith

53.     If ever there were a textbook case of a bad faith filing ripe for dismissal, it would be that of Spectrum, in which no fewer than ten of the foregoing factors are present. Based on the undisputed facts – as set forth in the Debtors' own documents, including their schedules of assets and liabilities:

(a) Spectrum is a single-asset debtor – its only asset is 100% of the XHI Stock, which is subject to the lien of the Noteholder Parties pursuant to the Purchase Agreement and the related Transaction Documents (as defined in the Purchase Agreement).

(b) Spectrum has *no* unsecured creditors.

(c) Spectrum is a mere shell company with no ongoing business or employees.

(d) Spectrum's petition (along with those of the other Debtors) was filed to preclude a foreclosure action by the Noteholder Parties. Indeed, the Debtors' bankruptcy filings occurred a mere one day after having received from the Agent a notice of exercise of remedies in connection with the Purchase Agreement and Notes.

(e) Spectrum's bankruptcy case involves a two-party dispute that can be more readily resolved in a state court action. Spectrum has no unsecured creditors and no secured creditors other than the Noteholders, which have a lien on Spectrum's only asset.

(f) Spectrum has no cash or income.

(g) Spectrum has not experienced any pressure from non-moving creditors, for a simple reason – Spectrum has *no* other creditors.

(h) There is no possibility of Spectrum's reorganization because there is nothing to reorganize. Spectrum is a mere shell company whose only asset is subject to the lien of a single group of secured creditors, and which has no other assets, operations, capital structure or employees.

(i) Spectrum was formed on June 3, 2011, a week prior to the Debtors' petitions, apparently for the sole purpose of receiving the illicit transfer of the XHI Stock from the Parent, in an attempt to hinder the Noteholder Parties from exercising their remedies. No notice was provided to the Agent and Spectrum did not enter into the required replacement guaranty and pledge agreement with the Noteholder Parties, nor did Spectrum assume the Parent's obligations under the Warrants, prior to its bankruptcy filing. In forming Spectrum and transferring to it the XHI Stock, the Parent obviated the need to file its own petition to prevent the Agent from exercising its remedies with respect to the XHI Stock.

(j) Spectrum filed for bankruptcy solely to create the automatic stay in order to prevent the Agent from exercising its remedies with respect to the XHI Stock. Spectrum itself has no other operations or assets to protect through a bankruptcy filing other than the XHI Stock, which is subject to the lien of a single group of creditors. Thus, there is seemingly no purpose for Spectrum's bankruptcy filing other than to gain the protection provided

by the automatic stay for its sole asset and to frustrate the legal remedies of its sole group of creditors.

54.     In short, the Parent's creation of Spectrum and the filing of its petition: (i) serves no valid bankruptcy purpose, such as preserving the going concern or maximizing the value of its estate; and (ii) was filed merely to gain for the Parent a tactical litigation advantage vis-à-vis the Agent. Spectrum holds a single, non-operating asset, the XHI Stock. Spectrum admittedly has *no* creditors, secured or unsecured, other than the Noteholders. Spectrum has no operations that need to be turned around with the aid of the chapter 11 process, and no liabilities other than with respect to the Noteholder Parties' lien on the XHI Stock. Further, Spectrum's chapter 11 case was filed on the eve of foreclosure by the Noteholder Parties. This is merely the case of a dispute between two groups of opposing parties, the rights and remedies of which are governed by applicable state law and, thus, more appropriately litigated (if at all) in a state court.

**B.    Appointment of a Chapter 11 Trustee Is Appropriate in the Cases of XHI, PRB, PGB and XLC (and, If Extant, Spectrum)**

**1.    Legal Standards Governing Appointment of Chapter 11 Trustee**

55.     Bankruptcy courts will allow a debtor to remain as a debtor-in-possession of its assets and business only where current management "can be depended upon to carry out the fiduciary responsibilities of a trustee." See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985). When the current management is incapable of performing these duties, or when creditors' confidence in such management evaporates, a chapter 11 trustee must be appointed. See In re Marvel Entm't Group, Inc., 140 F.3d 463, 473-74 (3d Cir. 1998). "[T]he appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the

integrity of the bankruptcy process and to insure that the interests of creditors are served." In re SunCruz Casinos, LLC, 298 B.R. 821, 828 (Bankr. S.D. Fla. 2003) (quoting In re Intercat, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000)); see also In re V. Savino Oil & Heating Co., 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) ("Section 1104(a) represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession").

56.     The Bankruptcy Code provides for the appointment of a chapter 11 trustee on two alternative grounds, both of which are present here. Section 1104(a)(1) provides for the appointment of a trustee for "cause." See 11 U.S.C. § 1104(a)(1). Even where "cause" is not established, section 1104(a)(2) provides for the appointment of a trustee "if such appointment is in the interests of creditors . . . and other interests of the estate." See 11 U.S.C. §1104(a)(2).

57.     Section 1104(a)(1) of the Bankruptcy Code provides, in pertinent part, that the court shall order the appointment of a trustee:

> for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, **either before or after the commencement of the case**, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

See 11 U.S.C. § 1104(a)(1) (emphasis added)

58.     As stated in section 1104(a)(1), prepetition conduct alone is sufficient to warrant the appointment of a trustee.  11 U.S.C. § 1104(a)(1); see also In re Rivermeadows Assocs., Ltd., 185 B.R. 615, 619 (Bankr. D. Wyo. 1995) ("the Code is clear that the prepetition conduct of the debtor's management may be the sole deciding factor" in the appointment of a chapter 11 trustee); Savino Oil, 99 B.R. at 526 ("pre-

petition course of conduct, in and of itself, constitutes 'cause' for the appointment of a Chapter 11 trustee"). Accordingly, a party seeking appointment of a trustee need not, and should not, delay filing a motion for such relief until after the debtor has had an opportunity prove its unsuitability as debtor in possession. See In re Colorado-Ute Elec. Ass'n, Inc., 120 B.R. 164, 175 (Bankr. D. Colo. 1990) ("if the facts and circumstances warrant the appointment of a trustee, it is not appropriate to wait to file the motion . . . . Such a deferral will only further delay the progress toward the effective rehabilitation and reorganization of the debtor").

59. While section 1104(a)(1) of the Bankruptcy Code expressly identifies four bases upon which "cause" may be found – fraud, dishonesty, incompetence and gross mismanagement – these enumerated grounds are not exclusive, and additional grounds may be available. See, e.g., Marvel Entm't, 140 F.3d at 472-73 (holding that "acrimony" between parties constituted "cause" under section 1104(a)(1)); Savino Oil, 99 B.R. at 525 (holding that a trustee was required where the debtor failed to disclose material and relevant information to the court). Importantly, once a court finds that "cause" exists, a trustee must be appointed – the court has no discretion to deny the requested relief. See Official Comm. Of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.), 385 F.3d 313, 318 (3d Cir. 2004); In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989); Savino Oil. 99 B.R. at 525.

60. "In the usual chapter 11 proceeding, the debtor remains in possession throughout the reorganization because current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." Marvel Entm't, 140 F.3d at 471 (internal quotations omitted).

However, where, as here, the current management has shown itself to be incapable of restructuring the Debtors' obligations, has proposed highly speculative exit strategies the risk of which will be borne solely by creditors and has engaged in prepetition dishonest acts, this rationale is absent.

61.     Alternatively, section 1104(a)(2) of the Bankruptcy Code provides, in pertinent part, that the court shall order the appointment of a trustee "if such appointment is in the interest of creditors . . . and other interests of the estate . . . ." 11 U.S.C. §1104(a)(2).  Thus, even where no "cause" exists, section 1104(a)(2) creates a flexible standard whereby the court shall appoint a trustee when it is in the best interests of the creditors and the estate.  Sharon Steel, 871 F.2d at 1226.

62.     In determining the best interests of creditors and the estate, courts "resort to [their] broad equity powers .... [e]quitable remedies are a special blend of what is necessary, what is fair and what is workable."  See Hotel Assocs., Inc. v. Central States SE and SW Area Pension Fund (In re Hotel Assocs., Inc.), 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980); see also In re Wings Digital Corp., 2005 WL 3789334, at *4-5 (Bankr. S.D.N.Y. May 16, 2005) (noting that section 1104(a)(2) is a "lesser standard" than section 1104(a)(1)).  In exercising their equitable powers to appoint a trustee under section 1104(a)(2), courts "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests."  See Hotel Assocs., 3 B.R. at 345.

63.     When determining whether the appointment of a trustee is in the best interests of the creditors and the estate, courts consider many factors, including: (i) the trustworthiness of the debtor, In re Evans, 48 B.R. 46, 48 (Bankr. W.D. Tex.

1985); (ii) the debtor-in-possession's past and present performance and prospects for the

debtor's rehabilitation, In re Parker Grande Dev., Inc., 64 B.R. 557, 561 (Bankr. S.D. Ind.

1986); (iii) the confidence, or lack thereof, of the business community and of creditors in

present management, In re Concord Coal Corp., 11 B.R. 552, 554 (Bankr. S.D.W. Va.

1981); and (iv) the benefits derived by the appointment of a trustee, balanced against the

cost of the appointment, In re Microwave Prods. of Am., Inc., 102 B.R. 666, 675 (Bankr.

W.D. Tenn. 1989); see also In re Madison Mgmt. Group. 137 B.R. 275, 282 (Bankr. N.D.

Ill. 1992) (enumerating same factors); In re Ionosphere Clubs. Inc., 113 B.R. 164, 168

(Bankr. S.D.N.Y. 1990) (same).

      **2.**     **"Cause" Exists For Appointment of Chapter 11 Trustee and Such Appointment Is in the Interests of Estate and Other Parties in Interest**

      64.    Not only does "cause" exist here to appoint a trustee in the cases of

XHI and the Operating Subsidiaries (and, if extant, Spectrum), but the appointment of a

trustee will also serve the interests of all parties in interest by assuring that the Debtors

will pursue all exit strategies that will maximize their estates' value, not just strategies

that would preserve equity value. At all times the Parent and the Debtors have been

managed by Mr. Pagon and his long-time management team. Mr. Pagon is the Chairman

of the Board, Chief Executive Officer, President and controlling stockholder of Parent.

Mr. Pagon beneficially holds a majority of the voting power of Parent's common stock,

including in respect of the election of Parent's directors. Their record speaks for itself.

      65.    First, as demonstrated above, the current management has

exhibited a level of dishonesty that is unbecoming of effective and ethical management,

showing a willingness to take any action to preserve its alleged equity value in the

Debtors, including violating the express contractual prohibitions on the transfer of a

major item of collateral that has been entrusted into their care – not once, but twice – in order to do so. Initially, there was the Parent's First Unauthorized Transfer solely for the Parent's tax benefit. Then, a few months later, there was the ultimate coup-de-grâce – the formation of Spectrum, the transfer of the XHI Stock to it without the knowledge or approval of the Noteholder Parties in willful violation of the Purchase Agreement, the Non-Recourse Parent Guaranty, the Parent Pledge Agreement and the Warrants, and the subsequent bankruptcy filing of Spectrum and the other Debtors.

66.     Second, the Debtors have been in default of the Obligations since early 2008, and have generated in excess of 75 defaults and events of default since then.

67.     Third, the Debtors have incurred █████████████████ operating losses since March 2008.

68.     Fourth, principal and interest has not been paid on the obligations since the March 2008 default.

69.     Finally, notwithstanding over three years of runway, the current management team has been unable to resolve those defaults despite their suggestions that a resolution is likely. Indeed, for over three years, the current management has presided over a situation where their companies managed to do little more than continually lose money and accumulate defaults under the Purchase Agreement and the other Transaction Documents. The outlook for the Debtors as they linger in chapter 11 remains bleak so long as the current management strategy, whatever it is, continues as is. Indeed, as set forth in the DIP Budget and the Debtors' Initial Monthly Operating Report, the Debtors project nothing but continuing operational and administrative losses, funded in part by their DIP financing. (See DIP Budget (see Hobart Exhibit 15); *Debtors' Initial Monthly*

*Operating Report, Ex. 1* [Docket No. 75] (see Hobart Exhibit 16).) In other words, the

Debtors' situation is not going to get any better under current management.[11]

72. The poor stewardship continues even post-petition. Saddled with

explaining why they filed chapter 11 cases in the face of a two-party secured creditor

collection dispute, the Debtors have hastily suggested two alternative exit strategies to

buy the Parent and manager more time – a new financing or a sale of assets – that current

management either (a) attempted to implement prepetition and failed or (b) never even

attempted to implement. In either case, the current management team, which is

hopelessly conflicted between its duty to the Debtors' estates and its desire to preserve

the Parent's equity, has demonstrated that it is incapable of satisfying the Obligations,

despite having had three years in which to deal with lenders. It is not clear how the

Debtors' intervening bankruptcy will change such unwillingness or inability of the

current management team to pursue a successful solution.

71. Both of these proposed strategies are highly speculative. Their

success depends upon the future actions of third parties – either the willingness of a new

lender to come forward and take a chance on an enterprise run by the same management

team that was unable to manage its existing debt obligations or the chance that Congress

might act to make necessary changes to relevant law to permit the profitable sale of

certain of their spectrum assets.

72. The Debtors' pending bankruptcy, meanwhile, will merely serve as

improper protection to stave off the collection efforts of creditors, who will bear all of the

---

11      Despite such losses and projected losses, the current management continues to accrue a healthy
        management fee, which totaled more than 25% of the Debtors' gross revenues for the month of
        June 2011. See *Debtors' Monthly Operating Report For The Period June 10, 2011 To June 30,
        2011 – Statement of Operations* [Docket No. 149].

risk of loss during the pendency of the bankruptcy cases. While the Debtors might enjoy any eventual upside from their strategy and ultimately preserve their equity, any downside will be borne by the Noteholder Parties as they must simply wait to see whether the Debtors' exit strategies will succeed. Indeed, the Debtors' projections show a company with precious little cash, an ending cash balance of $75,000 each month – thus putting all future actions at risk.

73. Unlike current management, a professional chapter 11 trustee will not confine himself to exit strategies that are designed to preserve an opportunity for equity to recognize value for themselves at all costs. Instead, a trustee will explore all options to maximize the estates' value, something the current management has either ignored or been unable to do.

74. Further, because no official committee of unsecured creditors has been appointed in these cases, there is currently nobody who will perform a "watch dog" role to assure that the current management is acting effectively or properly. The Court should appoint a chapter 11 trustee immediately and not wait until after current management has driven the Debtors into further operational and financial disrepair.

**C.    Conclusion**

75. This Motion seeks to prevent any abuse of the bankruptcy process through: (i) the dismissal of the chapter 11 case of Spectrum, which is nothing more than a shell entity created on the eve of the Debtors' filings to which the Parent unlawfully transferred the XHI Stock in order to prevent the Parent from having to file for bankruptcy protection and, thus, to shield the Parent from the bankruptcy process; and (ii) the appointment of a chapter 11 trustee in the chapter 11 cases of XHI and the Operating Subsidiaries (and, if extant, Spectrum) in order to ensure that the value of their

28

estates are properly preserved for the benefit of all parties in interest, and not merely the Parent's equity.

76.     Spectrum, which has no creditors other than the Noteholders, no assets other than the XHI Stock, and no ongoing operations, was created on the eve of bankruptcy in an effort to stave off the possibility of foreclosure. Moreover, the officers and directors have shown themselves incapable of reorganizing the Debtors despite having more than three years to do so since the initial breach of the underlying obligations. The Parent's attempt to hold on to the speculative equity value of the Debtors while imposing the risk of doing so on creditors is not acceptable.

## VI.     **No Prior Request**

77.     No previous request for the relief sought herein has been made to this or any other court.

## VII.     **Notice**

78.     Notice of this Motion has been provided to: (i) counsel for the Debtors; (ii) the Office of the United States Trustee for the District of Delaware; (iii) the creditors holding the twenty (20) largest unsecured claims against the Debtors, as listed on their chapter 11 petitions; and (iv) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Agent respectfully submits that, in light of the relief requested, no other or further notice need be provided.


[Remainder Of Page Intentionally Left Blank]

**WHEREFORE**, the Agent respectfully requests entry of an order,

substantially in the form attached hereto as **<u>Exhibit A</u>**: (i) dismissing the chapter 11 case

of Spectrum; (ii) appointing a chapter 11 trustee in the chapter 11 cases of XHI; PRB;

PGB; and XLC; and (iii) granting the Agent such other and further relief as is just and

proper.

Dated:  September 1, 2011

> MILBANK, TWEED, HADLEY & McCLOY LLP
> Mark Shinderman
> Haig M. Maghakian
> 601 South Figueroa Street, 30th Floor
> Los Angeles, California 90017-5735
> Telephone:  213-892-4000
> Facsimile:  213-629-5063
> Email: mshinderman@milbank.com
>          hmaghakian@milbank.com
>
> -and-
>
> ASHBY & GEDDES, P.A.
> Ricardo Palacio (#3765)
> 500 Delaware Avenue
> Wilmington, Delaware 19899
> Telephone:  (302) 654-1888
> Facsimile:  (302) 654-2067
> Email:  rpalacio@ashby-geddes.com
>
> *Attorneys for BPS AS LLC, as Agent*